# STRAFFORD,

## JULY TERM, A. D. 1843.

## PIERCE & a. *vs.* THE STATE.

It is the duty of the court to impannel, for the trial of each case, a competent and impartial jury. And in the execution of this duty, the court may propound, to the jurors returned, other interrogatories than those which they are required to put by the statute.

If a juror holds such opinions that he cannot, in a particular case, and upon a certain state of the facts, render a verdict according to the laws of the state, he is not a competent juror in that case.

The jury are not the judges of the law in criminal cases.

The statute of July 4, 1838, "regulating the sale of wine and spirituous liquors," (which provides, that if any person shall, without license from the selectmen of the town or place where such person resides, sell any wine, rum, gin, brandy, or other spirits, in any quantity, or shall sell any mixed liquors, any part of which are spirituous, such person shall, for each offence, on conviction thereof, forfeit and pay a sum not exceeding fifty dollars and not less than twenty-five dollars, for the use of the county,) is a constitutional exercise of the powers possessed by the legislature.

And it was *held* to be no defence to an indictment founded upon it, that the article sold without a license was a barrel of American gin, which the respondents purchased in another state, brought into this, and sold in the same condition in which they purchased it.

IN ERROR. At the January term of the court of common pleas, the plaintiffs in error were indicted for a violation of the provisions of the act regulating the sale of wine and spirituous liquors. The indictment alleged that on the 20th of January, 1842, they did unlawfully, wilfully, and without license from the selectmen of Dover, where they resided, sell to one Aaron Sias one barrel of gin, for the price of $11.85, contrary to the form of the statute, &c. ; to which they pleaded not guilty.

Upon the trial, the counsel for the state moved that an en-

quiry should be made, of the several jurors, whether they had formed an opinion that the license laws were unconstitutional. The counsel for the plaintiffs in error, then defendants, objected that the court had no power to put any questions to the jurors, except those mentioned in the statute. But the court ruled, that persons who held such opinions that they could not execute the laws of the state, were not suitable persons to serve on a jury, and directed the following questions to be put to each of the jurors, viz. :

1. Have you formed an opinion that the law regulating licensed houses is unconstitutional, so that you cannot convict a person indicted under it, for that reason, if the facts alleged in the indictment are proved, and the court hold the statute to be constitutional ?

2. Do you hold any opinions upon the subject of the license laws, so called, which will induce you to refuse to convict a person indicted under them, if the facts set forth in the indictment, and constituting the offence, are proved against him, and the court direct you that the law is constitutional ?

3. Do you hold any opinions upon the subject of the license laws which will induce you to convict a person indicted, if the court should direct you that the statute under which he is indicted is unconstitutional ?

The counsel for the defendants then proposed divers interrogatories to the jurors, some of which were admitted and put, and some were rejected by the court, to which the defendants excepted, but no argument was raised, upon this ruling, at the hearing of the case on error.

The counsel for the state introduced evidence to prove the sale of the gin, as set forth in the indictment ; and it was proved, and admitted by the defendants, that they sold to said Aaron Sias, on the day alleged in the indictment, one barrel of American gin, for the price of $11.85, and took from said Sias his promissory note, including that sum. It appeared that it was part of the regular business of the defendants to sell ardent spirits, in large quantities.

Pierce *v.* The State.

To sustain the prosecution, the counsel for the state relied upon the statute of July 4, 1838, regulating the sale of wine and spirituous liquors.*

The counsel for the defendants then introduced evidence that the barrel of gin was purchased by the defendants in Boston, in the commonwealth of Massachusetts, brought coastwise to the landing at Piscataqua bridge, and from thence to the defendants' store, in Dover, and afterwards sold to Sias in the same barrel, and in the same condition in which it was purchased in Massachusetts, and contended that the statute of July 4, 1838, was unconstitutional, and void, because it is in violation of certain public treaties of the United States with Holland, France, and other countries, containing stipulations for the admission of spirits into the United States; and because it is repugnant to the two following clauses in the constitution of the United States, viz.:—"No state shall, without the consent of the congress, lay any imposts, or duties, on imports, or exports, except what may be absolutely necessary for executing its inspection laws."—" The congress shall have power " " to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

The defendants' counsel further contended, that the jury were the judges of the law as well as of the facts in the case,—that it was their duty to judge of the constitutionality of the act of 1838, and to form their own opinion upon that question, and the court were not to instruct the jury relative to questions of law, as in civil cases, but were merely to give advice to the jury in matters of law.

---

* The statute is in these words, viz.: "An act regulating the sale of wine and spirituous liquors.

" SECTION 1. Be it enacted by the Senate and House of Representatives, in General Court convened, That if any person shall, without license from the selectmen of the town or place where such person resides, sell any wine, rum, gin, brandy or other spirits in any quantity, or shall sell any mixed liquors, part of which are spirituous, such person so offending, for each and every such offence, on conviction thereof, upon an indictment in the county wherein the offence may be committed, shall forfeit and pay a sum not exceeding fifty dollars nor less than twenty-five dollars, for the use of such county.

" SECT. 2. And be it further enacted, that the third section of an act passed July 7, 1827, entitled An act regulating licensed houses, and all other acts or parts of acts inconsistent with the provisions of this act, be and the same hereby are repealed."

" Approved July 4, 1838."

The court instructed the jury, that the position that the jury were judges of the law, as well as of the fact, as contended for by the defendants' counsel, was not correct to the extent of the general terms in which it was stated,—that the same rule existed, in this respect, in criminal cases, which prevailed in civil cases,—that it was the duty of the court to instruct the jury in relation to questions of law, and the court were responsible for the correctness of the instructions given; and in case of conviction, if the instructions were wrong, the verdict might be set aside for that cause,—but that the jury had the power to overrule the instructions of the court, and decide the law contrary to those instructions, through their power to give a general verdict of acquittal; and that if they did so, and acquitted the defendants, the court could not correct the matter, if the jury had erred, because the defendants could not in such case be tried again,—and that the circumstance that the jury had thus the power to overrule the instructions of the court, in case of an acquittal, did not show that they had a right to judge of the law.

The court further instructed the jury, that the statute in question was not entirely void, if it might have an operation constitutionally in any case; and that as far as this case was concerned, it could not be in violation of any treaty with any foreign power which had been referred to, permitting the introduction of foreign spirits into the United States, because the liquor in question here was proved to be American gin,—that this statute, as it regarded this case, was not repugnant to the clause in the constitution of the United States providing that no state shall, without the consent of congress, lay any duty on imports or exports, because the gin, in this case, was not a foreign article, and was not imported into, but had been manufactured in, the United States,—that this state could not regulate commerce between this and other states, and could not prohibit the introduction of articles from another state, with such a view, nor prohibit a sale of them with such a purpose,—but that, although the state could not

make such laws, with such views, and for such purposes, she was not entirely forbidden to legislate in relation to articles introduced from foreign countries, or from other states,—that she might tax them, the same as other property, and might regulate the sale to some extent,—that a state might pass health, and police laws, which would to a certain extent affect foreign commerce, and commerce between the states, and that this statute was a regulation of that character, and constitutional.

The jury having returned a verdict that the defendants were guilty, they filed a bill of exceptions, and brought this writ of error, assigning errors upon the foregoing rulings and instructions.

*J. P. Hale*, for the plaintiffs in error. It is said to be the duty of the court to have an impartial jury impannelled. That is what we asked for. But how can the jury decide the issue they are bound to decide, if they are to be examined before the trial, and bound to find as the court direct them in matter of law. How can they decide, if every thing that constitutes the essence of the crime is withdrawn from them by previous questions, the answers to which bind them to give a certain verdict.

There are two other questions,—

1. Whether the statute of 1838 is unconstitutional.

2. Whether the defendants have had a trial by jury.

As to the first; we do not propose to go into it. It is conclusively settled in *Brown* vs. *Maryland*, 12 *Wheat.* 419. The sophistry which attempts to show that this case is different, we shall not contend with.

As to the second question; the argument is said to be exhausted in *The People* vs. *Croswell*, 3 *Johns. Cas.* 337. It is so said by C. J. Weston. But we refer, also, to an *Essay on the Power and Duty of Grand Juries*, page 7, cited by *Mr. Justice Kent in his opinion in that case; English Liberties, p.* 259, *sect.* 4, *quoting Litt., sect.* 368; *De Lolme on*

*the Const. of England* 175 ; *Treatise of Stanhope on Juries ; Fortescue de Laud.* 117 ; *Hale's Hist. of the Common Law, ch.* 12; 1 *Hawk. P. C., ch.* 72, *sec.* 5 ; 4 *Black. Com.* 361 ; 3 *Bac. Abr.* 779 ; *Burns' Justice* 602, *fol. ed. ; American Citizen, by Oliver,* 279 ; 18 *Maine R.* 346, *The State* vs. *Snow ;* 3 *Co. Litt.* 155, *b, sec.* 234 *and note ; The Argument of Gen. Hamilton in The People* vs. *Croswell ; Commonwealth* vs. *Knapp,* 10 *Pick.* 478 ; *Commonwealth* vs. *Kneeland,* 20 *Pick.* 206.

By the constitutions of several of the states it is provided that the jury shall have the right to judge in libel, " as in other cases "; and by the sedition law they were to judge " as in other cases."

We are aware of authorities on the other side. In the case of Algernon Sidney, the instructions were almost precisely the same.

This is a political question. Not one of party politics, but one between the advocates and opponents of arbitrary power. It is unfortunate that it has been connected with the temperance reform. The friends of free government, popular rights, &c., are on one side. Those of legitimacy, aristocracy, &c., on the other. The legislature of New-York interfered, when some judges expressed an opinion that the jury had not the right. Our legislature have acted more wisely, in leaving it to the court to correct it. It will be in vain for the court to throw themselves before the car which carries on the progress of free principles. They would only be crushed by it. The main question is settled, so that it is beyond the power of the court to unsettle it.

*Walker, A. G.,* for the state, cited, to show the right of the court to propound questions to the jurors, *Const. of New-Hampshire, Articles* 17, 21 ; 2 *Blackford's R.* 476, *Jones, in Error,* vs. *The State of Indiana.*—Upon the right of the jury to judge of the law, 2 *Blackford's R.* 152, *Townsend, in Error,* vs. *The State ; Worthington on Juries* 47, 48, 61,

62;—and upon the question whether the law of 1838 is constitutional, *Crabb's Hist. Eng. Law* 489 ; *Province Laws* (2 *Geo. I.*) 59 ; *Ditto* (5 *Geo. II.*) 168 ; 6 *Greenl. R.* 413, *Lunt's Case ;* 9 *Wheat.* 195, 203, 235, *Gibbons* vs. *Ogden ;* 11 *Peters* 102, *Mayor, &c., of the City of New-York* vs. *Miln ;* 4 *Blackford's R.* 107, *Beal, in Error,* vs. *The State.*

GILCHRIST, J. I shall confine myself, in the opinion I propose to deliver, to stating the judgment of the court upon the question, whether the jury possess the right to decide the law in criminal cases, leaving the conclusions of the court upon the other questions that arise in the case to be declared by the chief justice.

The enquiry is, in substance, whether the plea of the general issue of not guilty, confers upon the jury the right to determine the law of the case. The question how far they may decide the law in civil cases, is not, in terms, before us ; but it will be necessary to examine it, for the purpose of deriving from the discussion such aid as it may give us upon this point.

The clause of the constitution of this state which relates to the " confirmation of laws," being the clause numbered 90, on the 39th page of the Revised Statutes, provides that " all the laws which have heretofore been adopted, used and practiced upon in the courts of law, shall remain and be in full force until altered and repealed by the Legislature, such parts thereof only excepted as are repugnant to the rights and liberties contained in this constitution."

At the time of the adoption of the constitution, the common law was the law of the state, so far as it was applicable to our institutions and the circumstances of the country. *The State* vs. *Rollins,* 8 *N. H. Rep.* 550. It might have been modified by statutes passed in the period from 1776 to 1792, by the judgments and practice of the courts, or by any repugnancy between it and the constitution, when the latter would, by its terms, be the paramount law. But no statute

affecting this question has ever been enacted here, and we are not aware that it was ever the practice of the courts to submit questions of law to the jury directly, or that their right to determine such questions incidentally, had ever been recognized. It becomes material, then, to ascertain, firstly, the doctrine of the common law upon this subject; and, secondly, whether the existence of such a right be consistent with, or repugnant to, the spirit of the constitution.

As a common law question, this must be determined by the authorities. Wherever they lead us, it is our duty to follow. Whatever result they may establish, it is our duty to declare. It is as little our duty, it is as inconsistent with our oaths, to throw upon the jury the responsibility of determining the law if it do not properly belong to them, as it is to assume to ourselves a jurisdiction which the law has not given us. We intend to do neither the one nor the other, but to state the law as we find it, upon a deliberate examination of the authorities and the constitution.

The statute *Westm.* 2, *c.* 30, (13 Ed. 1, A. D. 1285) is the groundwork of the arguments of those who assert the right of juries to determine questions of law. In one of Lord Erskine's most eloquent arguments, that in support of the motion for a new trial in the case of *The King* vs. *The Dean of St. Asaph,* he takes the position that, from the words of this statute, the right of the jury to decide the law upon the general issue was vested in them by the constitution. Other arguments, more or less plausible, have been urged in its favor in times of excitement, either from the absence of a sufficiently careful investigation, or because they were adapted to attain particular ends; but this statute, at first sight, seems more like an authority for the general position, than any argument or decision that has been made since its passage. The following is a translation of so much of the act as pertains to this subject : " The justices assigned to take assizes shall not compel the jurors to say precisely whether it be disseizin or not, so that they do show the truth of the fact, and re-

quire aid of the justices; but if they, of their own accord, are willing to say that it is disseizin or not, their verdict shall be admitted at their own peril."

Now, in giving a construction to this act, Lord Coke says that the first question was, whether, in case of assize, if the issue were joined upon a collateral matter out of the point of the assize, upon this special issue, the jury might give a special verdict. And it was resolved, that in all actions the jury might find the special matter of fact pertinent, and pray the direction of the court for the law. 2 *Inst.* 425. If any collateral matter, distinct from the general issue of *nul disseizin,* &c., were pleaded, then the assize was turned into a jury, instead of a separate recognition to try the fact. *Glanville, lib.* 13, *c.* 20, 21. The collateral matter was determined by the same recognitors *in modum juratae.* The jury were therefore limited to the collateral matter of fact out of the point of assize. But Glanville says that the assize could not decide upon the law connected with disseizin. He states that if the demandant object to put himself upon the grand assize, he must show some cause why the assize should not proceed. If the objection be admitted, the assize itself shall thereby cease, so that the matter shall be verbally pleaded and determined in court, *because it is then a question of law,* &c. If the assize could not determine questions of law, it would be the most groundless assumption to say that they could be determined by the jury, who were *to find only* collateral facts out of the points of assize.

The citation from Glanville is a strong authority against the right of the jury to decide the law upon a general issue involving law and fact. The implication from the latter part of the clause cited from the *stat. Westm.* 2*d,* is a strong argument against it. If the jury, " of their own accord, are willing to say that it is disseizin or not, their verdict shall be admitted *at their own peril.*" But what peril could they incur if, by deciding the law, they simply exercised a right given them by the statute? This phraseology is most singular, if the

statute was intended to submit the law to them.   The rea-
sonable construction of it is, that if the jury will undertake
to decide the law, they shall be subject to such penalty as
may be imposed upon them for exceeding their jurisdiction.
If they should incur a penalty, the act for doing which the
penalty is imposed must be illegal, for nothing is better set-
tled than that a penalty attached to the performance of an act
makes the act itself unlawful.

In *Townsend's Case, Plowd.* 111, decided about the year
1554, the jury undertook to decide a point of law as to re-
mitter ; and the finding of the remitter was held void, be-
cause it is not the duty of the jurors to judge what the law
is.   And the case of *Willion* vs. *Berkeley, Plowd.* 223, is ex-
press upon the same point.   It was there said, that, "at the
beginning of our law, it was ordained that matters of fact
should be tried by twelve men of the county where the
matter arises, and the matters of the law by the twelve judges
of the law."   To the same effect is the case of *Grendon* vs.
*Bp. of Lincoln, Plowd.* 493.   The maxim of the common
law, *ad quaestionem facti non respondent judices, ad quaes-
tionem juris non respondent juratores,* has been admitted by
all writers and courts of law, either in terms, or by stating
that the jury were not to determine the law.   *Co. Litt.,* 71
*b,* 72 *a ; Ibid.* 125, *a ; Oneby's Case,* 2 *Ld. Raym.* 1494 ;
*Trials per pais, c.* 14 ; *Rex* vs. *Dean of St. Asaph,* 3 *T. R.*
430, and innumerable other books of authority.

These authorities sufficiently establish the general position,
that the jury are not to decide questions of law.   But able
and learned men have nevertheless expressed the opinion, that
it was their right so to do, in certain cases.   Among them is
the celebrated Junius.   But the "*magni nominis umbra,*"
the political partizan, who, speaking of the terms of reproach
which had been applied to Lord Mansfield, threatens his
lordship that he will "collect the scattered sweets till their
united virtue tortures the sense"; the brilliant rhetorician,
who too often substitutes a showy antithesis for an argument,

is scarcely entitled to rank as an impartial legal authority. Sir John Hawles's pamphlet, published in the heat of the party excitements of 1680, must be placed in the same category. And M. De Lolme, in his work on the English constitution, although it would be unjust to rank him with these party writers, must be regarded simply as a learned foreigner, and sometimes showing that want of thoroughness and precision which even a learned man may display when writing on subjects which his previous education had not particularly fitted him to appreciate, and especially when discussing such a subject as the common law of England. The opinion of another eminent man, *Mr. Hargrave*, in *note* 276 to the second book of the Institutes, is deserving of more attention. He acknowledges that questions of law generally and more properly belong to the judges, yet as the jury may, as often as they think fit, find a general verdict, he thinks it was unquestionable that they might so far decide the law as well as the fact, such a verdict necessarily involving both. He says that for his opinion he has the authority of Littleton himself, who states in *section* 368, that if the jurors will take upon them the knowledge of the law upon the matter, they may give their verdict generally, as put in their charge. The opinion of Mr. Justice *Kent*, in *The People* vs. *Croswell*, 3 *Johns. Cases* 404, and the cases of *Commonwealth* vs. *Knapp*, 10 *Pick.* 496, *Commonwealth* vs. *Kneeland*, 20 *Pick.* 222, and *The State* vs. *Snow*, 18 *Maine R.* 347, are authorities to the same effect.

Now it is to be remembered that Littleton, in the section cited, was not examining the rights or powers of juries. He was discussing matters very different. The passage was introduced in explaining the pleadings in real actions relative to estates upon condition. His remarks are, in brief, that after an estate tail is determined for default of issue, the donor may enter by force of the condition. But in the pleadings he must vouch a record, or show a writing under seal, proving the condition; but though no writing was ever made of

the condition, a man may be aided upon such condition by a verdict taken at large upon an assize of novel disseizin, for as well as the jurors may have conusance of the lease, they also as well may have conusance of the condition which was declared and rehearsed upon the lease. And in all actions where the justices will take the verdict at large, there the manner of the whole entry is put in issue. He then adds: " if they will take upon them the knowledge of the law upon the matter, they may give their verdict generally, as put in their charge." An extended examination of the rights of juries would have been foreign to the particular matter in hand, and it was necessary for him merely to state the effect of a general verdict relative to estates upon condition. Littleton's treatise was written in the reign of Edward iv., between the years 1461 and 1483, and his remark is nothing more than a cursory statement of the provision of the *stat. Westm. 2d.* It is plain, from Lord Coke's commentary, that he did not understand Littleton as laying down the limits of the duties of jurors, or as meaning to go any farther than to allude to this statute. *Coke* says : " although the jurie, if they will take upon them, (as Littleton here saith,) the knowledge of the law, may give a generall verdict, yet it is dangerous for them so to doe, for if they doe mistake the law, they runne into the danger of an attaint." *Co. Litt.* 228, *a.* This by no means admits, but substantially denies, the right of juries to decide the law. If they may settle the law, their conclusion *is* the law, and they cannot " runne into the danger of an attaint."

The writers and courts who have founded the right of the jury to decide the law upon the form of the issue, do not, we say it with all respect, seem to have looked beyond the question directly before them, to the consequences which this right involves. If the form of the issue gives the jury the right to settle the law, what becomes of the right of a party to demur to evidence, or to file a bill of exceptions? The *stat. Westm. 2d., c.* 31, provides for the allowance of bills of

exceptions. And this must be upon some point of law, either in the admitting or denying of evidence, or a challenge, or some matter of law arising upon fact not denied, in which either party is overruled by the court. *Bull. N. P., part* 7, *c. 5.* Such a bill supposes the evidence *true,* and questions the competency or propriety of it. *Money* vs. *Leach,* 3 *Burr.* 1742. So a demurrer to evidence admits all the matters of fact which a jury might find, and brings the law arising on those facts before the court. *Gibson* vs. *Hunter,* 2 *H. Bl.* 187; *Cocksedge* vs. *Fanshaw, Dougl.* 118; *Cort* vs. *Birkbeck, Dougl.* 218. And from the allowance of these remedies, the inference is very plain that a jury cannot decide a question of law, although ever so closely connected with the fact, as is the point, whether the evidence offered *conduces* to the proof of the fact which is to be ascertained. And this does not depend upon the form of the issue, for it was never maintained that a bill of exceptions would not lie, or that a demurrer to evidence could not be taken and the law thus brought before the court, whatever might be the form of the issue,—whether not guilty, or some other general issue. But if, by the plea of the general issue, the right of determining the law be vested in the jury, by that plea it is withdrawn from the court, and the decision of the jury is final. But when was the position ever taken, that because the general issue of not guilty had been pleaded, therefore a bill of exceptions, or a demurrer to evidence, would not lie? In the trial of an ejectment, was it ever supposed that the jury could determine upon the effect of a legal limitation in a deed or will? Yet, there is the issue of not guilty, and the verdict may depend on a question of law, whether the plaintiff had a legal title or not.

It by no means follows, because the jury must pass both upon the law and the fact, by the form of the issue, that therefore they must determine the law. They may take the law from the court and apply it to the facts; and they thus deliver a verdict compounded of law and fact, or rather

a verdict made after they have considered the law and the fact. The form of the issue appears to the minds of some lawyers to possess some mysterious and inherent virtue ; but it is difficult to perceive in what way it operates to relieve the jury from the duty of receiving the law from the court, and acting upon it, and as it directs. The attempt to derive an argument from the form of the plea seems to result from a failure to discriminate between the application of the law to the fact, and the decision of the law by the jury. "Every species of criminal prosecution," says Lord Mansfield, " has something peculiar in the mode of procedure ; therefore, general propositions, applied to all, tend only to complicate and confound the question. No deduction or conclusion can be drawn from what a jury may do from the form of the procedure, to what they ought to do upon the fundamental principles of the constitution, and the reason of the thing, if they will act with integrity and a good conscience. The fundamental definition of trials by jury depends upon an universal maxim, without an exception, *ad questionem facti*, &c. Where the question can be severed, by the form of the pleadings, the distinction is preserved upon the face of the record, and the jury cannot encroach upon the jurisdiction of the court. But where, by the form of the pleadings, the two questions are blended together, and cannot be separated upon the face of the record, the distinction is preserved by the honesty of the jury. * * * It is the duty of the judge, in all cases upon general issues, to tell the jury how to do right, though they have it in their power to do wrong." *Rex* vs. *Dean of St. Asaph,* 3 *T. R.* 431.

Unless the power to do a thing necessarily implies the right to do it, the argument derived from the form of the pleadings falls to the ground. We cannot discover that the right of the jury depends upon any thing but their power to disregard the instruction of the court, which they may often do without detection, under the shield of a verdict of guilty or not guilty, as the case may be. Nor can we dis-

cover that the exercise of this right in criminal cases is supported by any other reasoning or authority than applies to civil cases. We are not called upon, at present, to deny the right of the jury previous to the passage of the *St.* 32 *Geo.* III. to find a general verdict in indictments for libels. That celebrated statute enacted, that in indictments for libel the jury might give a general verdict upon the whole matter put in issue, and should not be required to find the defendant guilty merely upon the proof of the publication, and of the averments or innuendos. The provision in the act, that "in cases where the jury shall find a verdict of guilty, the defendant may move in arrest of judgment, as *by law* he might have done before the passing of the act," is an express denial of the right of the jury to determine the law; for the necessity for a motion in arrest can never arise upon a verdict of not guilty. If the jury determine the law, why make a motion in arrest, which is a question of law? It will not answer to say that the court are to examine and revise the doings of the jury, for that would be a surrender of the whole argument. The statute says nothing positively concerning the right of the jury to decide the law. It was the opinion of the most eminent judges, that before the passage of the act, by the common law, whether a publication was a libel was a question of law; and it may be a matter of doubt whether the act conferred any further power upon the jury than to decide the fact. If any further power be conferred, in the case of libels, then this particular legislation, on one branch only of criminal law, tends to prove that in other criminal cases Parliament were satisfied to leave the rights of juries where the decisions of the courts had placed them. The belief that, in the trials for libel which preceded the passage of this act, the spirit of political intolerance animated the English ministry, caused the law to be enacted. Had it not been for this, had it been supposed that the accused were fairly dealt with, no feeling would probably have been aroused. The complication of

law and fact, which exists in all general issues, would hardly have been deemed the parent of so momentous a result as, under the circumstances, it was supposed to have produced.

Against the decisions which have been referred to on this point, in the state courts in this country, and which recognize the right of the jury to decide the law, may fairly be set off the opinions of *Lewis, C. J.,* in *The People* vs. *Croswell,* 3 *Johns. Cas.* 403; of *Mr. Justice Story,* in *The United States* vs. *Battiste,* 2 *Sumner* 243; of *Kent, J.,* in *The People* vs. *Stone, N. Y. Express, May* 17, 1842; and the case of *Townshend, in Error,* vs. *The State,* 2 *Blackford's (Ind.) Reports* 152.

The eminent lawyers who delivered the above opinions held that the jury could not determine the law. And the result at which we have arrived is that the juries have not the right to decide the law in any case; that this accords with the best authorities in the common law, and with other legal rights which must be surrendered if they may decide the law; and that they are bound by the law, as laid down to them by the court.

It may also be well to enquire what effect the decision of the law by the jury might have upon the rights secured to the people by the constitutions of the United States and of this state. Every subject of this state is entitled to a *certain* remedy, by having recourse to the laws, for all injuries he may receive in his person, property, or character, &c. *Bill of Rights, sect.* 14. Absolute certainty is unattainable, in disputed cases, and in such as require minute and careful investigation to be made into the meaning of statutes, and contracts, and which call for the application of particular rules of construction. Mankind are fallible, and neither courts nor juries can claim an exemption from the common lot. But the decisions of which tribunal would, on the whole, be the more certain—of the court, who must apply general principles and fixed rules to the exposition of the law; or of the jury, who must necessarily apply to it such knowledge of the law as they may have

collected in the course of the trial, and whose decision may be contradicted the next day, and reäffirmed the day after, by the verdicts of succeeding juries? The 23d article. of the Bill of Rights protects us from the effects of retrospective laws. But it is often a question of great difficulty, whether a law be retrospective or not. If that question be one which each jury is to determine upon the trial of each indictment, it will be impossible to know whether a law is constitutional, or whether it is, in the words of the Bill of Rights, " oppressive, injurious, and unjust." We should realize the truth of the remark, " *misera est servitus ubi jus est aut vagum aut incognitum.*" The 28th article of the Bill of Rights provides that no subsidy, tax, &c. shall be established, &c. without the consent of the people, or the legislature, or authority derived from that body. Suppose that a sum of money, assumed to be a tax imposed by the constitutional authority, should be inserted in a warrant to a collector, and that a person should be indicted for resisting the officer who attempted to collect the tax of him. Upon the plea of not guilty, could it have been the intention of the constitution that this question should be settled by the jury,—sometimes, as would be the case, in favor of the legality of the tax, and sometimes against it? The 30th article of the Bill of Rights ordains that the freedom of debate in the legislature shall not be the foundation of an action in any court. In an action for slander, let it be supposed that the court should instruct the jury that the evidence, if believed, proved the words to have been uttered in a debate in the legislature, and that the defendant was therefore not guilty. May the jury, notwithstanding, decide the question of law, that the occasion was not a debate, within the meaning of the constitution, and find the defendant guilty? Upon the trial of an indictment for a riot, if it should be proved that the respondents had assembled " in an orderly and peaceable manner," to petition the legislature for a redress of grievances, may the jury find the respondents guilty, against the instructions of the court, upon the ground that no

" wrongs" had been done them, and that they were suffering no "grievances?" In other words, may they expound the constitution, in this particular, or any other, and are the very foundations of all our civil rights based upon the impressions which twelve men, strangers perhaps to each other, may receive from a trial of a few hours' duration?

The constitution of the United States, and the acts of Congress made in pursuance thereof, are the supreme law of the land, and the judges in every state are bound thereby, &c. *Constitution of the U. S., Article* 6, *Clause* 2. If juries are not bound also, the question can never be settled whether a law be in pursuance of the constitution, and the courts must suspend their judgments until a sufficient number of verdicts has been returned, one way or the other, to render it probable that juries generally in future will return their verdicts the same way,—for no nearer approach to certainty could be made.

We cannot believe that impartial and reflecting men, of whatever profession they may be, can advocate doctrines which may lead to such results as the right of the jury to decide the law may end in. We cannot think that the people or their representatives would be content with an exposition of the constitution which would cause the constitutionality of the license law to remain an open question, until it could be settled by the verdict of a jury; of a body admirably adapted to the decision of questions of fact, but irresponsible, giving no reasons for their decisions, not subject to impeachment or attaint, without access to the sources of the law, and therefore unfitted for the investigation of legal rights. No reflecting man in the jury box would be willing to take upon himself this responsibility. He would feel that the question could not be examined with the deliberation it required; that the law could not be expounded with quite so much facility as it could be made,—and that there was no such inspiration in the jury box as would enable twelve men to determine, *per saltum*, grave questions which, elsewhere,

require care, and thought, and patient study, and time for undisturbed reflection. And it is the opinion of the court, that it is inconsistent with the spirit of the constitution that questions of law, and still less, questions of constitutional law, should be decided by the verdict of the jury, contrary to the instructions of the court.

PARKER, C. J. By the statute regulating the selection and services of grand and petit jurors, which was in force at the time of this trial, the justices of the courts, where they are returned to serve, are directed, upon motion from either party in the cause to be tried, to put a juror to answer upon oath, " whether he expects to gain or lose by the issue of the cause then pending ? whether he is in any way related to either party ? and whether he has been of counsel to either party, or directly or indirectly given his opinion, or is sensible of any prejudice in the cause ?" And it is further enacted, that " if it shall appear to the court that such juror does not stand indifferent in said cause, he shall be set aside from the trial of that cause, and another appointed in his stead." *N. H. Laws*, (*Ed.* 1830,) 467.

So far as this statute goes, it shows that it is the duty of the court to make an examination, on motion of either party, for the purpose of ascertaining whether the jurors stand indifferent, and to determine that matter; and the question is, whether the enactments of the statute just cited are exclusive, so that no enquiry can be made, except through the interrogatories directed by the statute to be put to the jurors, and no objection to the competency of a juror be admitted, except that he does not stand indifferent between the parties.

The first consideration which naturally presents itself, is, that there is nothing in the language of the statute which indicates an intention on the part of the legislature thus to confine the jurisdiction of the court. Upon the motion of either party, the court shall do certain things. This in no manner implies that they may not do others, if the ordinary

exercise of their powers and duties would require those other things to be done, had the statute never been enacted. It is not one of those cases where *expressio unius est exclusio alterius.*

The statute unquestionably was designed to secure the attendance of persons competent and suitable to perform the part of jurors in the administration of justice. It enacted that the selectmen should make a list of such persons, being inhabitants, of good moral character, and having a certain estate, as they should judge most suitable, and best qualified to serve, &c. ; and from this list the jurors required at any term were to be drawn. But notwithstanding all the diligence which the selectmen could exercise, a juror, at the time of the return, or of the trial, might be totally unfit for the performance of the duty. He might, before the return, have become *non compos mentis.* Could not the court enquire into that matter, on an allegation that he was so ? There is no provision in the statute for such an enquiry. But no one can for a moment hesitate to say, that it would be the imperative duty of the court to investigate the subject, and not proceed to try a case, with an insane juror upon the pannel. And if the court might institute an enquiry of that character, which the statute does not direct, what is there to prevent them from putting questions to the juror himself, in order to ascertain the state of his mind, although the statute has not framed any for that purpose.—So a case might occur where a juror, at the time of the trial, was utterly unfit to perform the duty, from intoxication. It is readily admitted that such a case must be rare, but its existence is not beyond the range of possibility. And it would be most absurd to contend, because the statute had made no provision for an enquiry of that character, that therefore the court could make none.

Other cases may exist where the juror, although he is neither *non compos,* nor intoxicated, is yet not qualified to perform the duties of a juror. And no case of unfitness can be more clear, than one, where the juror holds such opinions,

or has such conscientious scruples, that, acting upon those opinions, or scruples, he cannot, and will not, execute the laws of the land, so far as they depend upon the action of the jury. A juror who entertains such conscientious scruples upon the lawfulness of capital punishment, that he could not in any case, whatever might be the evidence, render a verdict which might subject the prisoner to loss of life, is manifestly an unfit person to try an indictment where the law would require him, upon evidence of wilful, deliberate, malicious homicide, to return a verdict of murder in the first degree. However fit and qualified he might be to try other cases, he would not be an impartial juror in a case of that character. He could not perform the duty prescribed by his oath, well and truly to try, and true deliverance to make, between the state and the prisoner. And accordingly in *Ferguson's Case, Rockingham, February term,* 1841, it was held that a person whose scruples extended so far, was not a competent juror upon such an indictment; and interrogatories were put to jurors to ascertain whether they had such scruples. The ruling in that case was not revised, for no exception was taken. But it had, at the time, the sanction of two of the judges of this court.

In the same case other questions, not prescribed by the statute, were propounded to the jurors, for the purpose of ascertaining whether they stood indifferent, and without bias. A similar practice prevailed in the *case of Emerson, Strafford,* —— *term,* 1817; in the *case of Furnald, Strafford, December term,* 1825; and in the *case of Corey, Cheshire, October term,* 1830. If this is a correct practice in capital cases, it cannot be rejected in those of less importance; and it is believed to have been the uniform course of the court. No case has been cited where a different practice was adopted.

But there is a still further enquiry here, and that is, whether the questions propounded to the jury were proper, in order to ascertain whether they were impartial and competent men. This depends upon the settlement of the next question in the

case, viz., whether the jury are rightfully judges of the law in criminal cases, constitutional law included. If they are, it is admitted that the questions were improper; for, whatever might be the facts, and the instructions of the court, they had the right to decide the law to be unconstitutional, and for that reason to refuse to convict. And if rightfully the judges of the law, the fact that they had already fixed opinions upon it, would not disqualify them. But if, on the other hand, they were not, by law, judges of the law, then, upon the practice already stated, no valid exception can be taken to the interrogatories.

Upon the question whether the jury have the right to determine the law in criminal trials, the case might well be left upon the learned opinion delivered by my brother Gilchrist. But having had occasion to rule this point, while presiding in the common pleas, I am disposed to add a few remarks upon this part of the case, even at the hazard of repeating, to some extent, the positions which have been already so ably stated by him.

So far as I am aware, it is not known, at the present day, what was the doctrine of the courts here, upon this point, before the Revolution. It is well understood, however, that the administration of justice was in general of a very inartificial character, and great complaints were made respecting it, up to that period. How much of this was owing to the want of a competent knowledge of its true principles, on the part of those appointed to administer the law, and how much to the alleged corruption of some of the incumbents of the bench, it is impossible now to determine. Certain it is that, true or false, allegations of the latter character were not wanting, in that period; and it is very clear that we cannot resort with much safety to the rulings or decisions of that time, for the purpose of determining a contested question, involving legal principles.

Even after the Revolution, and the adoption of the Constitution, although perhaps substantial justice was adminis-

tered in most cases, little can be claimed for the courts on the score of their scientific administration of the law, according to strict legal rules. It was not, in the very nature of things, that legal investigations should be pursued, at that day, as they have been since. Until within a very limited period prior to that time, the administration of the law in England, with the exception of the law in relation to real property, had been in a state of transition, and was in many respects crude and imperfect. And it was not to be expected that those in this country, who, upon the acknowledgment of its independence, had relinquished the sword, and were absorbed in the arrangement of the first principles of free political institutions, should immediately find time to study, effectually, and bring to the desired perfection, a code of rules and practice which should best carry into effect the principles of the common law, in regard to the administration of justice. If, therefore, we do not look with the utmost confidence to the period immediately succeeding the Revolution, for precedents, it is not a matter of reproach to the men who were then engaged in laying, broadly and deeply, the foundations of a government, one of the fundamental principles of which is, that " every subject of this state is entitled to a certain remedy, by having recourse to the laws, for all injuries he may receive in his person, property or character, to obtain right and justice freely, without being obliged to purchase it ; completely, and without any denial ; promptly, and without any delay ; conformably to the laws."—And another : " that it is essential to the preservation of the rights of every individual, his life, liberty, property and character, that there be an impartial interpretation of the laws, and administration of justice."

If it be admitted, that immediately succeeding the formation of the new government, the jury were to some extent, practically, the judges of the law, as well as the fact, in criminal cases, it can avail little in the determination of the point in question, for they were so, also, in civil cases. When

two or more judges sometimes charged the jury in the same case, stating different views of the law, and arguing, somewhat after the manner of counsel, upon the questions of fact in the case; and when no verdict, civil or criminal, was set aside for errors in the admission of evidence, or in the charge to the jury, it could not be otherwise than that the jury must be, to all practical purposes, judges of the law as well as the fact. They were occasionally obliged, in the conflicting opinions delivered to them by the members of the court, to seek a rule for themselves; and their opinion upon it was final. In these particulars, the early jurisprudence of this state probably did not differ materially from that of most other states in the Union.

It was not until some time after the commencement of the present century, that the practice obtained of granting a new trial, even in civil cases, for error of law, occurring during the progress of the trial, or in the verdict of the jury; and even subsequent to the time when that practice had been adopted, instances have been known in which different judges have given to the jury, in the same case, their differing views of its law and its fact.

The mode of correcting errors was by trying the case over again, and when the review allowed by law was exhausted, the legislature was appealed to, a hearing had there, and a further trial granted or refused, as to that body seemed expedient. And, if granted, it was under such rules and limitations as were thought to be just in that particular case. Instances occurred in which a new trial was granted, with a provision that the plaintiff should not be required to prove a particular matter, as a demand in an action for money had and received. Judgments were also annulled by the legislature, in some instances. But the granting of new trials by the legislature was held to be unconstitutional in *Merrill* vs. *Sherburne*, 1 *N. H. Rep.* 199, and the soundness of that decision is supposed now to be generally, if not universally, admitted.

It is obvious, from this brief review of some portion of our early jurisprudence, that it cannot furnish a rule for the action of the courts at the present day. It may be true, that it was then declared from the bench, that the jury were the judges of the law, as well as the fact, in criminal cases; although such a declaration must have been nearly gratuitous, as we have already seen, for they were practically so in civil cases also. It has undoubtedly been so said, at a later date. But this, only as a remark indicating the individual opinion of the judge who made it, without a formal adjudication. In fact, it can hardly be said to have indicated what should be designated as an opinion; for, after the practice had been adopted of setting aside verdicts in civil cases, for error of law occurring in the course of the trial, the court also granted new trials in criminal cases, for like error, where the defendant had been convicted. And this has been one of the great safeguards to the citizen, to protect him from being subjected to punishment, upon an illegal trial of his case. The error has not been corrected by a pardon, where the party had not been legally convicted, as has often been the case in England; but the court have acted as judges of the law, set aside the verdict, and sent the case to a new trial. And this has been done here, even in capital cases. 7 *N. H. Rep.* 287, *The State* vs. *Prescott.* Where, however, the defendant has been acquitted, in a criminal case, there has been an end of further proceedings. But this has never been supposed to be because the jury were the judges of the law, and had settled it, for they are equally so when they convict as when they acquit. The rule by which the trial is to be governed cannot depend upon the result. But it has been by reason of a clause in the constitution, declaring that no subject shall be liable to be tried after an acquittal, for the same crime or offence. The broadest construction, in favor of the accused, is put upon this constitutional provision, and no enquiry is ever made whether the acquittal has been upon a trial in which no error has been committed,

It is sufficient that the verdict is rendered upon such a proceeding, that if there had been a conviction, a sentence might have been pronounced.

The matter might perhaps have remained somewhat longer, in this state of practical denial of the right of the jury to judge of the law which has characterized our legal proceedings for more than a quarter of a century past, without attracting much attention, had it not been for a class of cases, of which this is one, which have recently assumed importance, if for no other reason, from the manner in which they have been contested.

When it was seriously and gravely urged upon the jury, that in criminal cases they were the judges of the law, as well as the fact,—that within the principle, they were to judge of the constitutionality of the laws enacted by the legislature, acquitting or convicting, as they should please to pronounce those laws unconstitutional, or otherwise,—that the rulings and instructions of the court, upon points of law, in criminal cases, might be entitled to respectful regard, as advice, but had no binding force, as a rule for the direction of the jury,—and that the jury ought to stand up for their rights,—the attention of the court was necessarily turned to the soundness of a principle which was to produce such results, and it became necessary to rule distinctly upon it. I may be permitted to say, however, that long prior to that time, general reflection upon the subject, without any particular examination of authorities, had led to a very strong belief that the doctrine was utterly unsound, and could not be sustained.

The examination which has since been made, has only served to confirm the opinions expressed at the trial. It is true, that some elementary writers seem to incline to the opinion, that in criminal cases the jury are constituted the judges of the law. The very slight reasons they have for so doing, have been sufficiently shown by my brother Gilchrist. Of the reported cases, none appear, necessarily, to

sustain such a doctrine. Bushell's case certainly did not necessarily involve any question whether the jury were judges of the law. If they were not, it might be but an arbitrary exercise of power to fine and commit them, because they had acquitted a defendant against the directions of the court in matter of law. It is said that Lord Ch. J. Vaughan, upon that occasion, " admitted that where the law and fact were distinct, the provinces of the court and jury were exclusive of each other, so that if it be demanded what is a fact, the judge cannot answer it, and if what is the law, the jury cannot answer it. But that upon all general issues, where the jury find a general verdict, they resolve both law and fact completely, and not the fact by itself."

This doctrine, if by " resolve" it is intended that they are judges of both, proves quite too much, as it proves, equally, that the jury are the judges of the law in civil cases, where the general issue is pleaded. The case therefore is of no greater weight than the early practice in this state, which was probably founded upon some loose doctrine of this description.

But the general doctrine was fully considered in England, by the court of King's Bench, in the case of the Dean of St. Asaph, and the conclusion, there expressed, stands as the general rule of law, in England, at the present day. At least nothing appears to the contrary in the reported decisions of the courts there. That was a prosecution for a libel. The judge in summing up told the jury that there were only two questions for their consideration, namely, the fact of the publication, and the truth of the inuendos. The court sustained the ruling, citing a uniform practice in favor of it.

I am by no means prepared to say that the general principle involved in the ruling, in the case of the Dean of St. Asaph, was correct. The question of libel or no libel sometimes depends upon the intent of the party, in making the publication, and the circumstances under which it was made. 9 *N. H. Rep.* 34, *The State* vs. *Burnham.* And a rule by

which the jury should be required to pass merely upon the fact of the publication, and the truth of the inuendos, if applied in all cases, would, in many, exclude the consideration of those circumstances. The court are not to judge of the truth of the evidence showing the circumstances, or the intent. Authorities therefore to show, that in cases of libel it has been submitted to the jury to pass upon the intent, and to find a general verdict, have, in my opinion, no weight whatever in the settlement of the question now before us. The jury have the right to find a general verdict in civil cases. 3 *Adolph. & Ellis* 506, *Mayor, &c., of Devizes* vs. *Clark.* And they have the same right in criminal cases. The libel bill, which was passed, perhaps, in consequence of the discussion of the case of the Dean of St. Asaph, did not profess to give the jury the right to judge of the law in criminal cases. It contained no language of that kind, as it certainly should have done had such been the intention of parliament. It enacted that on the trial of an indictment, or information, for publishing a libel, where issue was joined on the plea of guilty or not guilty, the jury might give a general verdict of guilty, or not guilty, upon the whole matter put to issue, and should not be required or directed to find the defendant guilty merely on the proof of the publication by him of the paper charged to be a libel, and of the sense ascribed to the same. But it provided that the court should, according to their discretion, *give their opinion or directions to the jury*, on the matter in issue, in like manner as in all other criminal cases,—that the jury might find a special verdict, as in other criminal cases,—and the defendant, on conviction, move in arrest of judgment, as he might have done before the passing of the act. The effect of it was to put cases of libel on the same footing as other cases.

The general doctrine, therefore, which has been quoted from the case of the Dean of St. Asaph, stands unaffected by the subsequent legislation, as it is unaffected by the subsequent judicial decisions in that country. If this position

needed the support of authority, it may be found in the opinion of Mr. C. J. Best, in *Levi* vs. *Milne,* 4 *Bing. R.* 195.

In this country there has been a difference of opinion upon this subject.

The case of *Georgia* vs. *Brailsford,* 3 *Dall. R.* 4, was a civil case, at *nisi prius.* If correctly reported, the charge to the jury explicitly recognized the ancient rule, that on questions of fact it is the province of the jury, and on questions of law the province of the court, to decide; and then immediately overturned the rule, by the declaration that the jury had nevertheless a right to take upon themselves to judge of both, and to determine the law, as well as the fact, in controversy. It is apparent that this case cannot be regarded as of any authority on this point, because it is thus inconsistent with itself, and because the rule is now fully admitted to be otherwise in civil cases.

In *The People* vs. *Croswell,* 3 *Johns. Cas.* 337, the court were equally divided. The best argument extant, in favor of this alleged right of the jury, is found in that case, in the opinion of Mr. Justice, (since Mr. Chancellor,) Kent. *Clarum et venerabile nomen. Serus in coelum redeat.* It must be remarked, however, that the case was a prosecution for a libel, and that the point in question was, whether the jury were confined to the consideration of the fact of publication, and the truth of the inuendos, or whether they might return their verdict upon the consideration not only of those, but of the intent of the party, and the circumstances of the case. The discussion of this matter naturally led to a consideration of the power and rights of jurors, in criminal cases generally, but no small portion of the authorities cited would equally well prove that they possessed the right in question in civil cases. Mr. Justice Thompson, who concurred in that opinion, must have understood that concurrence to be merely in the points necessary to the decision of that cause, or have subsequently changed his views; for I have his authority for saying, that he has repeatedly ruled that the jury are not

judges of the law in criminal cases. The opinion of Mr. Chief Justice Lewis, in which Mr. Justice Livingston concurred, although confined more to the consideration of the powers of the jury in cases of libel, is a strong authority against the plaintiffs in error on this point.

In *The United States* vs. *Wilson & Porter*, Mr. Justice Baldwin, on the trial of Wilson, told the jury that they would distinctly understand that they were the judges both of the law and fact, in a criminal case, and were not bound by the opinion of the court.  1 *Baldwin's C. C. Rep*. 99.  But subsequently, on the trial of Porter, he felt " constrained to make some explanations," not before deemed necessary, but then " called for from the course of the defence," which explanations, while they concede the power, substantially deny the right.  *Ditto* 108.  And according to the abstract in the case of *The United States* vs. *Shive*, he afterwards held that "the constitutionality of the charter of the Bank of the United States is not a proper subject for the consideration of the jury ;" and that " the construction of the constitution of the United States, by the Supreme Court, is binding on a jury, as well as the court."  *Baldwin's C. C. R.* 510.

*The Commonwealth* vs. *Knapp*, 10 *Pick*. 496, is hardly an authority for the plaintiffs in error.  True, the charge to the jury seems to favor their position to some extent ; but, upon the whole, it can be regarded as little more than an admission of the power of the jury to decide, through their right to give a general verdict.  It remains to be seen whether, when the matter shall be presented formally and directly to the consideration of the court there, the decision may not be adverse to the right, although the power is admitted.*

*The State* vs. *Snow*, 18 *Maine R*. 346, (in which the court rely upon the opinion of Mr. Justice Kent, before referred to, and on Commonwealth *vs*. Knapp,) is undoubtedly a direct authority in favor of the right.

Declarations of opinions by pamphleteers, and especially

* Such has since been the decision.—*Commonwealth* vs. *Porter*, 9 *Law Rep*. 455.

by political partisans, whether anonymously or otherwise, can hardly be regarded as authority, in a court of justice; and the arguments of even eminent counsel, which may not always involve the deliberate opinion of the counsel themselves, but be merely a fair matter of reasoning in behalf of their clients, are entitled to such weight only as the intrinsic merit of the reasoning may give them.

On the other hand, there are the rulings of Mr. Justice Thompson, before referred to, and I need not say that the opinions of that accomplished and distinguished jurist are entitled to the very highest respect.

The opinion of another eminent judge, Mr. Justice Story, is very explicit to the same point. " The jury have not the right, though they may have the power, in rendering a general verdict, to determine the law in any case, civil or criminal. It is their duty to follow the law as laid down by the court." 2 *Sumner's Rep.* 240, *United States* vs. *Battiste.*

The supreme court of Indiana has held the same doctrine. 2 *Blackford's R.* 151, *Townsend* vs. *The State, in error.* And that of Kentucky also, as I am advised, although the cases have not come under my observation. 3 *J. J. Marshall* 149, *Montee* vs. *The Commonwealth*; 5 *Littel's Rep.* 141. For an early case in Pennsylvania, see *Addison's R.* 257, *Pennsylvania* vs. *McFall.*

So much for authority.

Upon legal principles the broad doctrine upon which the plaintiffs in error rely cannot stand for a moment. The principle stated, so far as any principle is defined, is, in general terms, that in criminal cases the jury are the judges of the law. But the ancient maxim which assigns the decision of questions of law to the court, and that of questions of fact to the jury, does not recognize criminal cases as an exception to the rule. And upon discussion, it is at once admitted that the rule contended for is not true, to the extent of the language used. The court regulate the course of the trial, and decide upon the legal admissibility of the testimony offered; and if excluded

Pierce v. The State.

by the court, the jury cannot reverse the decision, or hear the witnesses. Here is a large class of questions in which the jury do not, and cannot, judge of the law ; and the principle, if admitted at all, must be very much modified. But this modification is no more recognized by the language of the principle, which it is said has prevailed so long and is so well settled, than that principle is recognized by the maxim before cited, regarding the duties of the court and of the jury. It is said, however, that the meaning is, that the jury are judges of the questions of law which are involved in the verdict they are to render, when the case is tried upon the general issue. This is by no means the broad principle first stated. It has more semblance of reason to support it, but it is equally unsound. The form of the issue does not confer the authority. It is a mere mode of presenting the case for trial. This is apparent from the fact that all general issues, in civil cases as well as in criminal, involve questions of law along with questions of fact. This is quite conclusive upon this part of the argument. If the form of the issue does not confer the authority in civil cases, it does not in criminal. It is adopted for convenience, and the complication of law and fact in the same issue is in no way inconsistent with the division of duties which assigns the determination of one class of questions to the court, and another to the jury. It is the right of the jury to ask instructions in matter of law involved in the issue, where the principles applicable to the case have not been sufficiently explained to them, and it is the duty of the court to give them when thus requested.

That the doctrine contended for by the plaintiffs in error cannot be supported, is perfectly clear, from some other considerations.

Where the defendant in a criminal case is acquitted, no further proceedings are to be had, as has been already remarked, by reason of the constitutional provision that no person shall be twice tried for the same offence. But in

cases of conviction, the defendant is entitled to move for a new trial, on account of error in the rulings or instructions of the court, or to have a bill of exceptions allowed for the same cause. On a motion for a new trial, not only the incidental rulings in the progress of the trial, but the instructions of the court to the jury, may be revised, and this is never done by the jury. It is assumed that the jury have followed those instructions, and if they were erroneous that injustice may have been done. But this could not be so, if the jury possessed the alleged right, because in that case they must be presumed to have corrected all errors they could reach ; and they surely, if judges of the law, might rightfully disregard, and overrule, the erroneous principles laid down in the charge of the court.

A bill of exceptions is a matter of right, for any alleged error in the trial. It is the duty of the court to allow it ; and then the supposed errors may be examined by the same or some other court, and the judgment, which has been rendered on the verdict, may be reversed. This procedure, as well as that of setting aside the verdict before judgment, and granting a new trial, for erroneous instructions by the court, is altogether inconsistent with the supposed right, and for the same reason. If the court are merely to advise the jury as to the matters of law, there would be no more propriety in setting aside the verdict on account of erroneous advice, than there would be in setting it aside because there had been an erroneous argument of counsel.

It is, furthermore, the uniform practice of the court to arrest the judgment if the indictment is defective, and this is not consistent with the principle contended for. On that principle, the jury must be supposed to have found the defendant guilty of some crime. Of what crime he was thus convicted, the court, in some cases of defective indictments, might find it difficult to determine, except by reference to what was alleged against him at the trial, and not spread upon the record ; and there might be some embarrassment

therefore, according to the usual practice, in rendering a judgment. But admitting the principle, it should certainly be understood that he was convicted of the offence which it was stated, on the trial, he had committed; and he should be sentenced accordingly, without reference to the record. It would be absurd to say that those who had not only the power, but the right, to judge, had tried and convicted him; and then to call upon another branch of the judiciary, which had not the right of judging, but merely that of advising, to say that he had been convicted of nothing for which he could be sentenced. Should it be said that the jury merely determine the law, so far as it is involved in the issue, and that the plea of not guilty only raises the question whether the defendant is guilty of the matters alleged in the indictment, the answer is that this shows that they have not the right of decision; for notwithstanding they intended to convict the defendant of a crime, and supposed they had done so, the court decide that the facts alleged and found do not constitute an offence.

The court are no more at liberty to disregard the motions and applications founded upon the powers just considered, than the jury have a right to disregard evidence which stands unimpeached; and so long as these powers are exercised, it is morally impossible that the jury should be, in any proper sense, judges of the law.

Defendants in criminal cases, generally, would hardly be willing to part with the protection and security which they derive from the power and duty of the court to grant new trials, allow bills of exceptions, arrest judgments, and to reverse them on error, for any advantages which could be gained by an admission of the principle, even in its broadest latitude. There are undoubtedly cases in which particular defendants would gladly waive their claim to this protection and security, if they might resort to that principle instead, there being no hope of safety for them, in any of the ordinary rules which regulate legal proceedings.

It is true that judges may become the tools of a corrupt administration, more especially in a monarchical government, and prostitute their official station to purposes of oppression. But such instances are rare, and in a popular government the danger of the accused does not lie in that quarter. There is much more reason for fear that judges, as well as juries, may be swayed by popular feeling, sometimes dignified by the name of public opinion, to make an example of him who happens to be an object of popular suspicion and prejudice.

It is true, also, that judges may be ignorant of the principles of the law they are sworn to administer, and the rights of the accused be thereby put at hazard. But it will hardly be supposed that men drawn each term from other occupations, who make no pretensions to legal knowledge, are to return in a few days to their former pursuits, and who are not responsible, even to impeachment, for their acts, will be more learned, sound, and safe expositors of those principles.

If any further matter is necessary to show that the jury have not and ought not to possess this right, it is found in the inconsistency which would exist between the administration of the civil and the criminal law, and in the uncertainty which must attend the administration of criminal justice, under the present organization of our courts, if such a principle were admitted. If one jury may so judge, all may. The decisions of one jury furnish no rule for the action of another. This is so as to matter of fact, and would be equally so in matter of law. No person could know what the criminal law was, for one jury might lawfully convict, even the same individual, upon a similar state of the fact, and under the same statute, upon which another had acquitted him. Had the jury in this case been advised that the statute was unconstitutional, and the plaintiffs in error been acquitted; another jury, in a subsequent case, on a similar state of the fact, and having similar advice, might, notwithstanding, rightfully convict them, having a different opinion upon the constitutional question. And it could never be settled, so far as

Pierce v. The State.

the administration of criminal justice was concerned, whether the statute is or is not constitutional. For if a case were carried by error to the Supreme Court of the United States, and that court should hold the law to be constitutional, that decision would be no more binding upon those who were rightfully judges of the law, in each case, than the instructions of a judge presiding at the trial.

The argument, that the power conclusively proves the right, has not been so strongly urged upon this occasion as it was to the jury, but this is not the first case in which that kind of reasoning has made its appearance. It was resorted to in The People vs. Croswell. But the proposition is certainly not commended to us by its law, its logic, or its morality. And it proves quite too much. If it were true that the legal power to do an act, without legal accountability for it, established a right to do that act, the jury might rightfully acquit the accused in all cases, without regard to the law or the evidence, for their power so to do is undoubted, and their exemption from accountability equally clear.

The remaining question relates to the constitutionality of the statute upon which the indictment is founded.

Prior to the Revolution, the several colonies had power, with the assent of the mother country, to legislate fully respecting their internal affairs ; and, of course, to prescribe the mode and manner in which trade should be carried on within their respective borders, and to adopt such police regulations as each might deem expedient. Upon the declaration of independence, and upon its recognition and the establishment of peace, this power of regulating internal trade, and police in general, remained with the several states. There was nothing in the union of the colonies for the purpose of general defence, nor in the powers granted to or assumed by the continental congress, at variance, or in any way in conflict, with such state legislation.

Nor was there any thing in the articles of confederation, adopted in 1777, to impair or limit the exercise of state legis-

lation upon matters having reference to the mere internal police of the several states. Each state not only managed its internal police according to its pleasure, but exercised that pleasure, to a very considerable extent, upon the intercourse of the country with other nations, notwithstanding the recommendations of congress: the articles of confederation providing that no treaty of commerce should be made whereby the legislative power of the respective states should be restrained from imposing such imposts and duties on foreigners as their own people were subjected to, or from prohibiting the exportation or importation of any species of goods or commodities whatever. This power of laying duties, and regulating, and even prohibiting, exportation and importation, which was retained by the several states, was one of the principal causes which led to the subsequent formation of the constitution of the United States.

All the rights and powers which the states possessed before the adoption of that constitution, they still retain, and may exercise, unless they are taken away, limited, or modified by it. The language of the tenth article of the amendments is express: " The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." It is very clear that the power of regulating the internal trade, and matters of police, of the several states, is not granted to the United States, nor prohibited to the states. As a general rule, it is undeniable that each state may manage affairs of that description as fully as it might do before the government of the United States was formed, except in cases where there is an express prohibition in the constitution; and if the right to pass laws which regard the prevention of crime, pauperism, and misery, and the promotion of the health and happiness of the citizens, by imposing restraints upon the sale, and upon the excessive use of the means of intoxication, (which has been supposed to be a very important branch of police,) is taken away by the constitution, it must

be by some grant of power to the general government inconsistent with further legislation of that description by the several states. And if they are thus deprived of it, by implication, it is lost entirely; for there is no grant of power, in the constitution, which will enable the government of the United States to exercise any such authority. There is no express or implied grant, by which that government can regulate the internal trade of the states in relation to this, or any other article. It has never attempted any such thing. Congress has never assumed to itself any such right, nor ever denied the right of the states.

For more than half a century, the United States have exercised all the powers delegated by the constitution which it seemed good to that government to exercise; and the states, during the same time, have, at their pleasure, passed laws respecting the sale of liquors within their borders, requiring licenses, to such extent as each pleased, in order to authorize sales; and during all this time there has been no conflict, or collision, between the general and state governments on the subject. Nor, until very recently, so far as we are aware, was any supposition entertained that the enactment of laws of that description was not still within the constitutional power of the states. Even now, the denial of this constitutional right comes not from that government, or from any of its officers or agents. There is nothing to show any objection, on the part of the constituted authorities of the United States, to laws like that now in question. On the contrary, so far as congress has legislated within its own sphere, its legislation has of late been of a kindred character.

This unchallenged exercise of the power for such a length of time, it is admitted, does not prove conclusively that it is constitutional, but it certainly furnishes an argument of no inconsiderable weight.

The inquiry then might be narrowed down to the question, whether this exercise of power by a state is so repugnant to the powers granted in the constitution to the general govern-

ment, that the states cannot pass laws of that description, there being no action of that government upon the same subject-matter in conflict with them.

But it may be well to take a broader view of the subject.

It is, perhaps, not material to the decision of this case, but it may be remarked that state legislation is not to be held unconstitutional, because in its operation it may incidentally and remotely have a bearing upon some of the powers granted to and exercised by the general government—that it may, for instance, in some degree affect, indirectly, the revenue of that government. Various acts of legislation by the states must have a bearing upon that revenue. Every charter of a company for manufacturing purposes may have a tendency to reduce importations. The exemption of any branch of manufactures from taxation, for a limited time, may do so. And so of every act to improve the breed of sheep, or cattle, or to promote the raising of cotton, hemp, or silk.

It is not, therefore, sufficient for the condemnation of a state law, that its possible operation may be to render a particular exercise of a power of the general government of less pecuniary benefit to that government, so long as other modes are left open to it, through which it may fully and effectually accomplish its purposes. If this were enough to render an act unconstitutional, hardly any exercise of authority would be left to the states.

Nor is it sufficient that it may so operate as to induce or even require that government to seek new sources of revenue, by reason of the falling off in a particular branch of trade, if that result is produced by what would otherwise be a constitutional act. The constitutionality of the law does not depend upon the mere degree in which it may indirectly affect a branch of the revenue of the United States. That furnishes no criterion by which to judge of the constitutional right.

In order to render the act unconstitutional, because of its collision with the powers granted to the government of the

union, there must be some conflict, or repugnancy, or incompatibility. It must, either in its actual exercise, or in its nature, be of a character to control, defeat, limit, or impair, some power of the general government, or interfere with its action, so that, if admitted, that power could no longer be efficacious and adequate to accomplish the object for which it was given.

If it merely operates upon the same subject-matter, but not in such a manner as to show " a plain incompatibility, a direct repugnancy, or an extreme practical inconvenience," it is not unconstitutional, because there may be " a possible or potential inconvenience."

It has been contended, that the statute in question is repugnant to the power of the president, with the advice of the senate, to make treaties, and the powers of congress to regulate commerce with foreign nations, and among the several states.

In relation to the first and second branches of this objection, it might be answered that this case does not necessarily involve their consideration, because the liquor sold by the plaintiffs in error appears to have been manufactured in the United States. But as the argument to be drawn from the power of the United States to make treaties, and to regulate commerce with foreign nations, is so intimately connected, in principle, with that relating to the power to regulate commerce among the states, we have considered the case as broadly as the objection of the plaintiffs in error has presented it.

It would be foreign to the present occasion, to enter much at large into the causes which led to the adoption of the constitution of the United States, although those causes may well be taken into consideration, when the nature and limits of the powers granted come under review. Ample discussions upon that subject may be found elsewhere. It is enough for our present purpose to remark, that all the powers with which it has been supposed the statute of July 4, 1838, is in conflict, are from their nature limited powers, notwith-

standing the broad terms in which the grant of power is expressed. It would be impracticable, were we to attempt to enumerate all the subjects to which these powers extend, and to affix precise limits to their exercise. But it is easy to point out matters which are excluded from their scope.

Thus the general power to make treaties, confers authority to negotiate with other governments, and to form compacts relative to the proper subject-matters of treaty stipulation, such as peace, war, commercial intercourse, alliances, &c. A treaty has been defined to be " a compact of accommodation relating to public affairs," but the political rights of the people of the several states, as such, are not subjects of treaty stipulation. It needs no argument to prove that an attempt on the part of the United States, by compact with a foreign government, to qualify the right of suffrage in a state, prescribe the times and mode of elections, or to restrain the power of taxation under state authority, would transcend the limits of the treaty-making power, and be entirely void ; and an agreement with a foreign government, prescribing the terms on which highways should be laid out in the states, regulating the support of paupers, or the sale of goods by auctioneers, or by hawkers and pedlers, would be of the same character. The police of the several states, regarded as separate governments, is not a subject-matter to which the treaty-making power extends. And it is not pretended that the treaties which admit liquors, the manufacture of other countries, into this, on the most favorable terms, contain any stipulations which purport to limit the legislation of the several states, after the import has taken the character of property within a state, the act of importation being fully accomplished and perfected. Nothing of that kind, it is believed, has been, or will be, attempted by the government of the United States.

And so of the power to regulate commerce with foreign nations. Under this grant of authority the national government may prescribe rules for the trade with other communities, determine the kind, quality and condition of the articles

which may be imported, the time and manner of the transportation, the mode of introduction into this country, and the terms of it; and doubtless may provide for the safe-keeping in the public stores, and for a lien upon them until the duty is paid; but should that government attempt to make laws for conducting the internal affairs of the states, under the guise of enactments to regulate foreign commerce, it would be flagrant usurpation. When the articles which previously formed the subject-matter of foreign commerce have become a component part of the mass of property in the hands and at the disposal of the citizens or residents of the state, the business of importation has terminated, and the connection of those articles with the regulations of foreign commerce has ceased. And with the termination of that relation, the right of the national government to regulate the transmission, safe-keeping and sale, ceased also, until they shall again become articles of foreign commerce, by being exported, or articles of commerce among the states, by a transit to another state. Even before their connection with foreign commerce ceases, they may be subject to the police of the states, as in the case of quarantine laws, and this without conflict, so long as those laws are kept within their appropriate boundaries.

Similar remarks apply to the power to regulate commerce among the several states. This has respect to trade and commercial intercourse between the different states, interchange of productions, and transportation of commodities from one to another, with the means, time, manner, terms, &c. The power to regulate this commerce is vested in the general government. But that government, under pretence of the exercise of this power, cannot prescribe rules for the sale or taxation of articles which form the subject of it, after they have become the subject-matter of internal trade within the state whither they have been carried; nor enact laws to regulate the police of the state, so far as it may affect such articles. That government cannot enact that lottery tickets, or

immoral books and pictures, shall not be carried from one state to another, for that would be a law, the end, purpose, and effect of which would be solely a regulation of internal police, affecting the sale—the mere conveyance of the article from one state to another, being, of itself alone, a matter of entire indifference.

On the other hand, the power to regulate the internal police of the state, which is lodged in, and guarantied to the state authority, has for its objects, the inhabitants and residents of the state, considered as such, (notwithstanding they at the same time owe duties to the United States, and are under obligations as citizens of that government,) and all the property within its limits which may fairly be regarded as a part of the mass of property in the state. Property may be within its territorial limits, but not for some purposes within its jurisdiction; as property belonging to the United States, articles of import within the public stores on which the duty has not been paid, &c. An attempt to specify and limit the particular mode and manner in which this power may be exercised would be hopeless and useless. It has relation to the peace, security, and happiness of the community, regarded as a single government, and may provide for the prevention and punishment of offences, the prevention of pauperism and idle and dissolute habits, the preservation and promotion of industry and economy, health and morals. But, notwithstanding it embraces so wide a range, it is not an unlimited power. The several states cannot impose duties upon the entry of goods, nor prescribe what vessels shall come into their ports, or on what terms; nor give a preference in their markets to articles produced within their respective limits, in order to encourage the industry of their own citizens. Nor can they, under pretence of preventing pauperism, or of providing for the security of their own citizens, prohibit the importation of certain articles from a foreign country, or another state. The transit and introduction of any article of commerce are under the supervision and jurisdiction of the United States,

with which a state may not interfere, except in the case of quarantine laws (postponing the entry a suitable time for the protection of the health of the community,) harbor regulations, and other laws of a similar character.

The power of state police, so far as it relates to those matters which have been the subjects of foreign commerce, or of commerce among the states, acts upon them generally after the transit has been accomplished. When the particular trade between another nation and this country, or between different states, is ended, and the property which formed the subject of it, from being property in one government, and then *in transitu*, has, by that commerce and change of place, become part and parcel of the mass of property in a particular state, released from the charges of the national government, and from its superintendence, that property can claim no exemption from the operation of the laws of the state where it is situate, regulating its safe-keeping, sale and use—those laws being general laws, affecting other property of a like character in a similar manner; and being, in good faith, but parts of the internal police of the state where it is situated, and not, in effect, regulations of the commerce which brought it there. The fact that the article had been transported from another nation, or state, and that it had before that time been the subject-matter of commerce between two countries, or states, cannot, after such change is perfected, confer upon it, in respect to the operation of state police, any character different from that possessed by other component parts of the general mass of property there. The general government would no longer be under any obligations to provide for its safe-keeping, or protection, nor owe any duty to the citizens of the state respecting it. And the state, being bound to afford suitable security and protection to it, as property there, may regulate it accordingly like other property. We are by no means prepared to admit that imports, in the hands of the importer, discharged from the superintendence and claims of the United States, and incorporated into the mass of property

there situate, are not proper subjects of state taxation, ratably with other property produced within the state. The business of the importer is not the business of the government, nor is he exempt from taxation by the states, because he pays to the revenue of the national government.

A right to tax the property, in proportion to the taxation of other property, may well consist with the denial, in *Brown* vs. *Maryland*, of any right in a state to raise a revenue by requiring importers to procure a license before they can sell. And this denial may be consistent with the assertion and admission of a right to require them to procure a license, without charge, before they are authorized to sell ardent spirits, if the same law applies to all venders and manufacturers. A person may be an importer, and yet a very unsuitable person to be entrusted with the sale of an article liable to great abuse. But it is not necessary for us to discuss this topic.

There is no danger to the powers of the government of the United States from this doctrine. On the contrary, it is that best calculated for their preservation, by preventing them from being pressed out of their proper sphere, and made the means of limiting the action of the states, in cases where that government has not attempted to interpose any objection to such action, and where, if the states cannot legislate, there is no remedy for the evil.

In a political system like that which exists in this country, where the powers of the different governments border so closely upon each other, being in many instances precisely similar in their nature, and often acting upon the same property, the line of division, where the power of the one ends, and that of the other begins, in relation to a particular subject-matter, can in some instances be determined only by a consideration of the object, operation, and effect of the enactment. Its constitutionality must depend upon its real character, upon the end designed and to be accomplished, and not upon its title or professions. If, under the general government, an act be ostensibly a regulation of foreign com-

merce, that will not give validity to provisions regarding, in their effect, merely the internal police of the states. If under the state authority the end to be attained be merely a matter of internal police, the legislation will not be invalid because it may act upon articles of commerce. Will it be contended that a law forbidding sales of merchandize upon the Sabbath would be unconstitutional and void, so far as imported articles were concerned, even while they were in the hands of the importer, because it was a regulation of foreign commerce? We suppose not. If a state may act as to the time, it may as to the manner, of sales.

We believe, therefore, that the full exercise of the power of internal police, by the several states, is perfectly consistent with the most plenary exercise of all the powers of the United States, which have been supposed to conflict with the statute drawn in question in this case. If it be supposed that this police power may, remotely and indirectly, affect the action of that government in some particular, still there can be no conflict. As if, for instance, laws regulating the sale of liquors should diminish consumption, and thus cause a falling off of the revenue derived from that article. No act regulating the sale of liquors can possibly affect the revenue of the general government so as to impede its action or impair the efficiency of its powers. It has at all times ample sources of revenue in other modes. Nor can such an act affect its power to make treaties, or regulate commerce, for the reason already stated, that compacts and regulations of that character have regard to the introduction of the article into, or its exportation out of the country, and not to its sale within the states, after the importation is accomplished and ended. These powers may have full scope and efficiency should every state in the Union prohibit the sale of spirituous liquors within their respective borders. The treaties and laws made under them do not stipulate for, or order sales, and have not, in all cases at least, the right to do so.

It will be no answer to this reasoning to say that the states,

if they may prohibit or regulate the sale of one article of commerce, may do the same as to all others, and that the action of the general government may therefore be rendered entirely nugatory, in relation to importations. Such is not the fact. The states can act only within the scope of the powers reserved. Should an attempt be made by a state to prohibit the sale of imported iron, or salt, or sugar, or cotton goods, within its limits, or to tax articles, the produce of another state, beyond the rate of similar articles produced within its own borders, it would very readily be seen that such legislation was not a regulation of internal police merely, but that its design, and its effect, if admitted, must be the regulation of foreign commerce, or commerce among the states, also. It would not have for its object merely the internal trade of the state, as such, but it would be an act relating to that trade, in its connection with a commerce beyond the limits of the state, with a view of affecting, and to some extent regulating, the latter also. One of the ends to be accomplished would be the limitation of such external commerce. Whether an act, professing to regulate merely the sale of such articles, would come within the same condemnation, must depend upon its particular provisions and operation, and the objects to be accomplished by it. Should a state pass a law requiring only the venders of spirituous liquors manufactured elsewhere to procure a license, the obvious object and effect of it would be to give a preference to the means of drunkenness produced within its own limits, and to exclude, as far as such a regulation might do so, competition from abroad. It could not be regarded as a law intended to promote habits of temperance, and thus prevent the commission of crimes.

From what has been said, it will be seen that we regard the statute of July 4, 1838, as one of internal police. It was doubtless intended as a regulation of the internal trade of the state, in the particular specified, and such is its legitimate end and effect. One object to be effected by it must have been to place the trade in liquors, where it existed, in the hands of

Pierce *v.* The State.

suitable persons to be entrusted with such business; and another was, doubtless, by the diminution of the consumption of them, to prevent, in some measure, the manifold evils arising from intemperance, and to secure to the people the benefits to be derived from its suppression, so far as the act might have that effect. It is in collision with no treaty stipulations, nor has it any thing to do with regulating foreign commerce, or that among the states. It raises no revenue here, nor could its object be to limit that of the United States. It does not forbid the introduction of any thing into the state, or the use of any article here by him who purchases it elsewhere. It acts upon the sale of articles brought from other places, after they have become a component part of the mass of property in this state. It did so in the present instance. It is similar in its provision to previous legislation, existing here ever since the formation of the present government, and long before that time, with the exception that it operates upon greater quantities, and may, therefore, include a very few more venders. But the constitutionality of the law cannot depend upon the size of the cask, or the number of gallons it contains. The legislature may regulate the sale of large quantities as well as small—of fifty gallons, when brought from other places within the limits of the state, as well as of a single one. It does not prohibit sales in any quantities, but merely requires a license to authorize them. Incidentally, and indirectly, it may have a possible effect, in a limited degree, upon foreign commerce, and upon revenue, by lessening consumption, if licenses should be refused to any great extent; which, however, is not a necessary result from its provisions. But a decrease in the consumption of ardent spirits was not regarded by the authors of the Federalist as an evil. While suggesting that the article, under federal legislation, might be made to furnish a considerable revenue, they declared that if the proposed rate of duty "should tend to diminish the consumption of it, such an effect would be equally favorable to the agriculture, to the economy, to the morals and to the

health of society." A state law, which has a tendency to produce these effects, may well be regarded as a matter of state police, and it would be a subject of great regret if such a law should fall within the condemnation of the constitution of the United States. It will certainly be a very remarkable decision, which shall make a distinction, in regard to such laws, between liquors manufactured in the state, and those introduced from a foreign country, or another state; and, it may be added, that one which shall place the latter beyond the reach of such state legislation must be disastrous in the extreme.

The course of reasoning which seems to be demanded by the position of the plaintiffs in error, if pursued, would deny all power in the states, at any time, to tax any article, or to provide any regulation respecting the safe keeping, or sale, of any article which had been imported from a foreign country, or from another state. If the importer have a right of sale exempted from state legislation, there must be a corresponding right of purchase; and it may certainly be said, with much appearance of plausibility, that if the importer have a right to sell, because he has imported, the party who purchases from him has an equal right to sell, or to put the article to the use for which it was designed, because he has purchased. The principle of a rule, which should confine the exemption from state authority to sales by the package in which the article is imported, is not readily perceived, for the article may have become mixed up with, and a part of, the mass of property in the state, while in the original package, in the hands of the importer. But if such rule be admitted, it will be easy to enlarge the exemption, by diminishing the size of the package; and if the law now in question should be held unconstitutional, it would not require the lapse of another half century to raise the argument that all state legislation respecting ardent spirits, lottery tickets, gunpowder, bowie-knives, &c., must be confined to such of the articles as are manufactured within the state enacting the

laws. The vender of lottery tickets, in a lottery authorized by the laws of another state, will allege that he purchased in that state where the article was lawfully sold as property, that he brought and sold them in the same package in which he purchased, and that he is not therefore amenable to laws which regard his traffic as demoralizing, and impose a penalty upon the sale of such tickets. The purchaser from him will rely upon the authority of congress to regulate commerce among the states, to justify himself in disposing of whatever he has purchased, having by his purchase acquired a right to sell also. And the same reasoning which shall give to the importer of ardent spirits the right to sell, and the purchaser from him a right to re-sell, or to use, without the imposition of restrictions by state authority, (because such restrictions interfere with commerce and tend to diminish importation,) must put the traffic of the importer of Chinese crackers beyond the pale of state legislation, and perhaps give to the boys, who purchase his wares, a constitutional right to fire them in the streets, and set city ordinances at defiance. Whether it may not also be contended that penalties upon drunkenness, and divorces for habitual intemperance, must be confined to cases where the intoxication is caused by liquor manufactured within the state, remains to be seen.

We have considered the statute in question, as it truly is, a law regulating the sale. It is not a statute of prohibition. The fact that the tribunal having the authority to license, in a town, may, in the exercise of its discretion, refuse to grant any license within that town, does not change its character. Laws requiring hawkers and pedlers to procure a license, are not laws prohibiting sales in that mode; notwithstanding licenses may be refused. But if this were a law prohibiting the sale entirely, we are not prepared to say that it would not still be a constitutional exercise of the legislative power of the state. With the most profound respect for the opinions of the late venerable, and very learned chief justice of the United States, we cannot concur in an incidental remark,

found in *Brown* vs. *Maryland*, that "there is no difference in effect between a power to prohibit the sale of an article, and a power to prohibit its introduction into the country." If the sale be prohibited, it may, notwithstanding, be introduced for use by the person importing, for export to another country, or for the purpose of being sent to another state and sold there, if a sale there be lawful. And we may further remark, that the force of the reasoning in the dissenting opinion of another very learned judge, in that case, must confine the authority of the case to the precise point in issue.

We have already admitted that the states may be restrained, in general, from prohibiting the sale of articles imported. They cannot do so against the legislation of congress, by virtue of any rights reserved to them. The prohibition, under whatever pretence, would be in effect a regulation of external commerce. But in those cases where the sale of the article has been, and may yet be, regulated, as a mere matter of police, for the promotion of the safety, prosperity, and happiness of the people, it is by no means clear that if regulation shall not be found effectual to accomplish the object designed, even prohibition may not be resorted to, without any conflict with the powers of the national government.