---
Dover *v.* Portsmouth Bridge.
---

## DOVER *v.* THE PORTSMOUTH BRIDGE & a.

The chancery powers of this court under the statute of 1832 did not comprise a general chancery jurisdiction. If it had power to abate nuisances, it must have been under the power to issue injunctions to prevent injustice; whether it had under that power, *quere?*

A town cannot maintain a bill to abate a nuisance, upon the ground that individual inhabitants are affected in their private interests. As the owner of property, a town has similar rights with other owners; and such owners, to maintain a bill for abatement, must allege some particular grievance beyond that sustained by the public generally.

Under authority of separate acts of the legislatures of Maine and New-Hampshire, the proprietors of Portsmouth Bridge erected a toll bridge across the Piscataqua river, from the bank of the river in one State to the bank in the other. The town of Dover, as owner of wharves above the bridge, and in behalf of its inhabitants, as having rights of navigation, &c., in the river, brought a bill in equity against the proprietors, praying that they may be enjoined from further supporting and maintaining said bridge; — *Held*, that the bill could not be maintained.

The town of Dover does not, as an owner of wharves, appear to have sustained any injury by the bridge, other than such as is common to private owners of like property.

The bridge being erected under color of authority of the State, if it be a nuisance, it would seem that the proper proceeding for its abatement would be an information in the nature of *quo warranto*, instituted by the attorney-general; or, on indictment by the grand jury; or, if this State is estopped by its grant, then by proceedings in the courts of the United States.

Dover v. Portsmouth Bridge.

No such proceeding would lie in favor of the town of Dover, upon the ground that the bridge obstructs the passage of vessels of war up the river.

Equity will grant an injunction to restrain a nuisance only in cases where the fact is clearly made out.

The case shows no such departure from the grants, in the position or manner of construction of the bridge, that it can be held not to be erected within the powers granted. If there have been variations of such a character, and the plaintiffs have sustained any special damage thereby, not common to others, they may have a private suit.

State legislatures may authorize the erection of bridges over the navigable waters within their respective limits, if the powers and action of the United States interpose no objection. The entire sovereignty over such waters of the States is vested in Congress and the several State legislatures.

As independent States, and even under the articles of confederation, New-Hampshire and Massachusetts might have made a compact for building such a bridge as they deemed expedient over the Piscataqua, though it to some extent impeded the navigation of the river; and the inhabitants above would have no claim for consequential damages.

Maine having succeeded to the rights of Massachusetts, the acts of New-Hampshire and Maine, authorizing the erection of the bridge, are valid, unless the constitution of the United States interposes an objection.

Those acts are not invalid, either as being a compact between States, or as being in conflict with, or an obstruction to the powers given by the constitution of the United States to Congress, to regulate commerce, to lay and collect duties, and to provide and maintain a navy; and there has been no legislation of Congress, in the formation of treaties or otherwise, which renders the erection or continuance of the bridge unlawful.

The grant of power to Congress to regulate commerce does not of itself operate to restrain States from erecting or authorizing the erection of structures, such as bridges and dams, upon the navigable waters within their limits, which may impede, or even in a particular place totally obstruct the passage of a vessel, if no actual legitimate legislation of Congress is contravened.

In the exercise of that power, Congress may make rules and regulations which will necessarily, to some extent, control and restrain State action authorizing obstructions upon navigable rivers; but Congress cannot declare bridges, &c., erected by State authority, in the absence of conflicting legislation of Congress, to be nuisances, or prohibit their further continuance. In such case Congress must legislate with reference to the existing state of things and rights of property.

---

Dover *v.* Portsmouth Bridge.

---

But if, under the pretence of accommodating travel, &c., the design or principal effect of a bridge were to destroy commerce, or impede or obstruct any lawful exercise of authority by the United States, it would be a nuisance, which ought in some way to be abated.

THE bill as amended set forth, that there is, partly in this State and partly in the State of Maine, an arm of the sea, or Piscataqua river, dividing said States by its centre below Bloody Point, in Dover, to the ocean ; that the town of Portsmouth is situated below said town of Dover, on the westerly side of said river, near its outlet to the sea ; that the town of Dover is situated above said Bloody Point, on the Cocheco, a branch of said Piscataqua ; that, under the laws of the United States, Portsmouth, has long been the sole port of entry for the district of Portsmouth, and Dover has long been a port of delivery in said district ; that said rivers, from the sea up as far as the "Landing," and certain wharves in Dover, have ever been tide waters, and for a long time, under the laws of the United States, navigable for ships and other vessels ; that said Piscataqua river has always been a free and public highway for all citizens of this State ; that the United States have expended large sums of money for the improvement and navigation of the Cocheco and Berwick branches of said river, above said Bloody Point ; that, prior to the grievances set forth in the bill, said river could at all times be easily and safely navigated by vessels and boats of every description ; that the inhabitants of Dover, being duly licensed by the United States, had enjoyed and still ought to enjoy such navigation to and from the harbor of Dover without let or hindrance ; that the town of Dover is seized in fee of certain wharves, at said "Landing," adjoining the highway, from the use of which by vessels and freights passing over said river said town has made great gains ; and that said town and its inhabitants had been greatly benefited and advantaged by the free and unobstructed navigation of said river, the

free use, and natural flow, current, and channel, of which they ought continually to have.

That the Proprietors of the Portsmouth Bridge, a body corporate within this State, have, within twenty years, without right, built, and still continue, between said Portsmouth and the town of Kittery, in Maine, across said Piscataqua river, and below said Bloody Point, a bridge; which bridge greatly obstructs the navigation of said river, is destructive of life and property, and is a public nuisance to said Dover, its inhabitants, and other citizens of the State; that said proprietors have contracted with Lewis Hayes to fill up a large portion of the channel of said river in this State, at and near said bridge, and there to sink in said river large quantities of stones and rocks, which cannot be removed; that said Hayes, in pursuance of his contract, has already there so sunk large quantities of stones and rocks, so as to fill up said channel, and threatens further so to do; whereby the navigation of said river, between the harbors of Portsmouth and Dover, has and will further become difficult, dangerous, and destructive to life and property, and will be wholly destroyed, and said river become inconvenient and unsafe for said town of Dover and its inhabitants, and the citizens of this State using the same; all which will be to the public damage and nuisance of the plaintiffs, and all others residing near said river, and deprive them of their rights in and to said river; and that said corporation pretend that they are authorized to erect and maintain said bridge, by an act of this State passed in the year 1819, and an act of the State of Maine passed in the year 1821, but that the plaintiffs insist that both said acts are against the constitution of the United States, and in violation of treaties of the United States, &c., and that neither this State nor the State of Maine has authority to permit the construction of such a bridge within its own territorial jurisdiction, much less to permit its extension

Dover *v.* Portsmouth Bridge.

upon the bank in the other State, without such State's consent.

The bill prays for process enjoining the defendants from so depositing stones in said river, and from further maintaining said bridge, and for further relief.

The answer admits the statements of the bill, save that it denies that said Cocheco Branch above Bloody Point is navigable for boats or vessels of any description, except at high water, and then only for vessels of small size, and states that licensed coasting vessels, belonging to the inhabitants of Dover, still, at such times as the tide permits, pass to and from said landing to Portsmouth harbor and elsewhere; and alleges ignorance as to any title of the town of Dover in the wharves, and as to any benefit said town and its inhabitants have had by the free navigation of the river.

The answer further states, that from the early settlement of the country there has been a public highway over Piscataqua river, between the towns of Kittery and Portsmouth, which has been the main road for the conveyance of the mails of the United States; that up to the year 1819 said river was crossed by means of ferry boats, which method of crossing was inconvenient, expensive and dangerous:

That public convenience and necessity required a bridge across said river, between said towns, for the safety and convenience of travel and transporting said mails upon said highway; and that in the year 1819 this State, by an act of its legislature, created the Proprietors of Portsmouth Bridge, a body corporate, with authority so to erect and maintain such a bridge between the towns of Kittery and Portsmouth, and between the main land and Ham's Island, in Portsmouth, and with the right to "build and maintain a bridge across said river Piscataqua, commencing at any place on the margin of said river between Rindge's wharf, in said Portsmouth, and the town of New-

ington ;" and by an act of the legislature of Maine, the same proprietors were empowered to erect and maintain a bridge over said river, between said towns of Kittery and Portsmouth :

That after accepting said acts, said proprietors paid, as compensation for the loss of the income of the ferry, $4,000 to the owners thereof; and in the year 1822, at great expense, erected a bridge, in accordance with the provisions of said acts ; and ever since, at further great expense, have maintained said bridge, subject to the tolls authorized by said acts ; that said bridge is of great utility to all citizens of the United States who have occasion to cross said river, and in conveying the public mails ; that the portion of said bridge between the main land in Portsmouth to Ham's Island is five hundred feet in length, and is constructed with a draw of convenient width for the largest merchant vessels that have ever been in the harbor of Portsmouth to pass and repass ; and the length of the portion of the bridge from said island to the Kittery shore is seventeen hundred and fifty feet, and is in some portions thereof seventy feet in height from the bottom of the channel of the river, and rests upon posts framed into piers driven into the bottom of the river :

That said bridge was constructed with a draw originally thirty-three feet wide, which the proprietors have caused to be opened without delay for the passage of all vessels having occasion to pass through it ; also with two piers, one above and one below the draw, convenient and safe for vessels to moor to, until wind and tide should favor a convenient and safe passage through it ; also that the bridge was so constructed that at least in one place boats and gondolas could at all times pass with safety, and that there was originally a convenient arch, fifty feet wide, in said bridge, of sufficient dimensions to permit all boats, gondolas and small craft to pass freely through it ; and that the justices of the superior court of New-Hampshire approved the plan of said bridge before it was built :

That in 1826 said proprietors, at the request of certain citizens of Dover and others, enlarged said arch to the width of seventy feet, and between it and said draw made two other open spaces, of the width of seventy feet, for the passage of boats and other craft; and in 1825 said proprietors enlarged the draw between Ham's Island and Kittery to the width of forty feet, and securely placed a buoy above and near it; and in 1828 they enlarged the draw between Portsmouth and Ham's Island to the width of thirty-eight feet:

That said bridge and draw somewhat obstruct and delay vessels in the river, and passengers upon the highway over the bridge, but that the bridge is so constructed, and the draw so managed as to .cause the least possible delay and inconvenience; that vessels of one thousand tons can freely pass through the draws of said bridge; that the defendants have no knowledge that larger vessels have ever frequented the harbor of Portsmouth, except vessels of war, which come to the navy yard, about one mile below the bridge; that they have been informed that steamboats have frequented said harbor of such size that they could not pass through said bridge, but for which they might pass up the river near to Bloody Point, but they have never heard of their so doing before the bridge was erected, or attempting to do so since; and that vessels and steamboats can pass through said draws of much larger size than can navigate the Cocheco, within several miles of Dover Landing, where the complainants allege that they own wharves:

That, owing to the depth of the river and other causes, in order to make the bridge secure, and keep and maintain it within the provisions and obligations of their charter, the defendants were advised to cause stones to be thrown into the river at one point under said bridge; whereupon they directed their agent, Nathaniel B. March, to cause the same to be done; who contracted with Lewis

Hayes to so throw into the river for said purpose one thousand tons of stone; and said Hayes, in the summer of 1840, in pursuance of said contract, did throw into said river six hundred and ninety tons of stone, which, answering the purpose, the contract was discharged; but that should it become necessary, in the judgment of skilful and experienced engineers, for the preservation and maintenance of said bridge, they design further to deposit stones to construct a pier at said point; that, should the construction of said pier at said point become necessary, it will be so far distant from the arch and draws, and so wide is the passage of water, that they are informed and believe that such pier would form no obstruction; and that said bridge does not cause any effect upon the ease and facility of navigating said river.

The plaintiffs produced evidence of the ownership and occupation of the wharves stated in the bill, the character and number of the vessels navigating the river Cocheco to Dover Landing, the building of vessels at said landing, with evidence of the position, plan, dimensions and construction of the bridge, the depth and currents of the river, the navigation of the Piscataqua and Cocheco rivers; of appropriations and expenditures by the United States government to improve the navigation of the latter river; and of the obstruction of, effect upon, and danger in navigation caused by the bridge.

The defendants produced their charter, with evidence of the approval, by the judges of the superior court of New-Hampshire, of the plan upon which the bridge was constructed, of alterations in said bridge, to meet the wants and desires of the people of Dover and other towns in the vicinity, as set forth in the answer; and evidence in rebuttal as to the effect of the bridge upon navigation, especially subsequently to such alterations.

*C. W. Woodman* and *P. R. Freeman,* for the plaintiffs.

---

Dover *v.* Portsmouth Bridge.

---

Assuming that the town of Dover has rights and interests in the navigation of the rivers, entitled to protection, and that the doings and intended doings of the defendants are prejudicial to such interests, and are a wrong and nuisance to the plaintiffs, or to the public, the court has jurisdiction in equity to grant relief by injunction, and prevent the impending future mischief. Statutes of 1832, R. S. 171, sec. 7; Eden Inj., ch. 1, p. 1, 2, 147, and ch. 11; *Case of Lord Barnard,* cited 2 Har. Ch. Pr. 182, 183; 1 Fonbl. Eq. 31, *Att'y Gen'l* v. *Richards,* 2 Anstr. 603.

The continuance of a nuisance is a ground of complaint, and the nuisance may be abated and demolished, to prevent future injury. 1 Com. Dig., Action upon the Case for Nuisance, B, D, 1, 2; E, 1, 6 do., *Quod permittat,* A. B.; 5 Co. R. 101, *Penruddock's Case;* 2 Salk. 460, *Portsmouth Harbor ;* 6 Exc. 343, *Att'y Gen'l* v. *Burridge ; Att'y Gen'l* v. *Parmeter ; Parmeter* v. *Att'y Gen'l,* 10 Price 350–464.

This court, then, under its power to grant injunctions to prevent injustice, has jurisdiction as a preventive remedy.

The jurisdiction does not depend upon the character of the parties, but on the matter of the suit and the remedy sought. *Newcastle* v. *Prior of Falmouth,* and other cases cited in Harg. Law Tracts 79–81; *Att'y Gen'l* v. *Richards,* cited in Eden on Inj. XI., p. 158; Eden on Inj. 162, 163; Story's Eq., sec. 924.

Purprestures and encroachments upon navigable rivers, to the injury of his majesty's ports, have always, in England, been abated and removed by judgment upon complaint. Harg. Law Tracts 79–81; *Case of Bristol,* 14 E, 1; *Case of Ravensroad,* 20 E, 1; *Case of Men of Newcastle* v. *Prior of Tinmouth,* Par. Cases, 5 Car. 1.

The evidence shows rights and interests of the town of Dover in the navigation of the river Piscataqua, which the defendants have injured, and further threatened. Hale *de Jure Maris,* ch. 4; Harg. 11, ch. 6, p. 36.

The bridge is not constructed within the terms and restrictions of the statutes of New-Hampshire, authorizing its construction, either as to position, or the conditions prescribed for preserving navigation.

The statute will not be presumed to divest or impair private rights or property, unless it so most explicitly declares; it must therefore be construed with the implied condition that no private or local rights shall be infringed or injured.

The statute of New-Hampshire has no operation beyond the limits of that State; it must therefore imply that the State of Maine would consent to have the bridge built into that State. But Maine has given no such assent. She has created a distinct corporation, amenable to her jurisdiction alone, and with which the New-Hampshire corporation does not and cannot unite.

Admitting, however, that the acts of the two States apply to the bridge, and that New-Hampshire might grant all the powers exercised in constructing and maintaining the bridge, she has not done so. There has been no grant to warrant the nuisance, and the further impediments and obstructions threatened by this bridge. This bridge is not such a structure as can be authorized over a public navigable river which different States have a right to use. 2 Domat 402, 403, Art. XI., XII.

Neither New-Hampshire nor Maine could alone authorize the building of this bridge; and the separate grants of the two States, taken together, as authorizing it, are void, as violating the provision of the constitution of the United States, which denies liberty to the States to enter into compacts or agreements with each other without the consent of Congress.

Whatever cannot be effected by the authority of a single State, cannot, without the assent of Congress, be effected by the joint or concurrent authority, express or implied, of two or more States. Such a concurrence is an

agreement between States within the intent of the consti-
tution.

But were the bridge wholly within the State of New-
Hampshire, the act of that State is void and invalid, to
authorize its erection.

The act is repugnant to the constitutional powers of
Congress to regulate commerce, to collect duties, to pro-
vide and maintain a navy, to provide for the general
defence, and to protect each State from invasion. It is
repugnant to and in conflict with the exercise of the
powers of the general government to establish ports of
entry and delivery, and respecting revenue, navigation
and trade, and treaties with foreign nations. *McCullock*
v. *Maryland*, 4 Wheat. 436; *Gibbons* v. *Ogden*, 9 Wheat.
189; *Ostrom* v. *U. S. Bank*, do. 865–867; *Brown* v. *Mary-
land*, 12 Wheat. 419; *Weston* v. *Charlestown*, 2 Pet. 449;
*Harris* v. *Dennie*, 3 Pet. 292; *Dobbins* v. *Com'rs of Erie
Co.*, 16 Pet. 435.

*I. Bartlett*, with whom was *Hackett*, for the defendant.
One question is, whether this is such a nuisance that a
private party can interfere.

The court has no jurisdiction of the case in chancery.
The chancery jurisdiction of this court, which is given it
by R. S. 171, secs. 6, 7, is limited. *Parsons* v. *Parsons*,
7 N. H. Rep. 309.

In other States jurisdiction in cases of nuisance is given
expressly.

The plaintiffs contend that the court has jurisdiction
under the power to issue writs of injunction; but this
power is to be exercised only to administer a remedy in
cases where the court has jurisdiction in chancery. We
find no case to the contrary.

If the court has jurisdiction in this matter generally,
the town of Dover has an ample remedy at common law.

The town of Dover cannot come here as a public prose-

cutor. They cannot come here unless they show an injury to their wharves; and the case shows no such injury. All cases of injury referred to in the plaintiff''s argument are those sustained by the public.

The plaintiffs have proved no seizin in fee, only an occupation.

A public nuisance is not the subject of private prosecution unless private damage is sustained. *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 444.

Whatever is suggested or argued in relation to nuisances is not within the scope of the bill.

Consequential damages in a case of this character are not the subject of a private prosecution. *Thurston* v. *Hancock & a.*, 12 Mass. 220; *Callender* v. *Marsh*, 1 Pick. 418.

The plaintiffs ask whether this bridge is not an injury to their interest, and answer as if the sovereign power could not make improvements which might be consequentially injurious.

All the navigation which ever came to the plaintiffs' wharves comes there still.

The bridge is constructed within the limits of the charter, with draws larger than the vessels using them require, and according to the plans approved by the justices of the superior court.

Neither of the cases cited by the plaintiffs intimates that one State may not make a grant in its own jurisdiction, and another make another grant.

Domat, cited by the plaintiffs to prove that the grant authorizes· a bridge only directly across a river, is good authority to show that a bridge may be erected across navigable water; but old Col. Frink is better authority how a bridge should be built across the Piscataqua.

The several grants of the two States are not compacts between States. The ground taken by the plaintiffs would preclude States from granting authority to erect a bridge to the middle of the stream.

Dover *v.* Portsmouth Bridge.

PARKER, C. J.　The 9th section of the statute of December 29, 1832, which was in force when this bill was filed, gave to this court chancery jurisdiction in cases of gifts, grants, devises, &c., for charitable uses; and also in all cases of fraud, trust, accident, or mistake; cases respecting the adjustment of the concerns of copartners, joint tenants, and tenants in common, where there is not a plain, adequate and sufficient remedy by the rules of the common law; with power to decree a specific performance of executory contracts; and power to make all equitable and necessary decrees, orders and judgments, proper to carry into effect the powers thereby given.　It also authorized the court to grant writs of injunction, whenever the same should be necessary to prevent injustice, and any justice of the court, to issue writs of injunction to stay proceedings or waste until the end of the next term in the county, unless sooner dissolved.　And it enacted that the powers and jurisdiction thus vested in the court should be exercised according to the established principles of chancery, as far as should be consistent with the laws of the State, and in conformity with the usual practice of chancery in like cases.　Laws of November session, 1832, p. 75.

Some addition has since been made to this jurisdiction, but nothing which appears to be material to the present case.

It will readily be perceived that this jurisdiction, although very extensive, does not comprise a general jurisdiction in equity.　We have had occasion to say that we had no jurisdiction to compel a settlement upon a married woman out of property which came to her by descent during the coverture, that branch of equity jurisdiction being separate, and not comprehended within any of the grants of power in the statute of 1832.　9 N. H. Rep. 309, *Parsons* v. *Parsons*.

There is no grant of powers in relation to nuisances by

name.   If such a jurisdiction may be exercised, it must
be under the power to issue injunctions to prevent injus-
tice, and it is to this branch of the equitable power that
the plaintiffs appeal in this case.   The jurisdiction of a
court of equity over nuisances is treated of by Mr. Jus-
tice Story, under the title of Injunctions.   2 Story's Eq.
Jur., secs. 920–928.   See, also, 2 Johns. 379, *Attorney-Gen-
eral* v. *Utica Ins. Co.;* Mitford's Pl., by Jeremy, 144.

   The office of an injunction is in general that of re-
straint to stay further measures; but it is apparent that
unless extended beyond that operation it is not an appro-
priate remedy for any grievance complained of in this
case.   If the bridge of the defendants be a nuisance, as
the plaintiffs allege, there has been no time when the
court could have restrained the defendants from erecting
it by preventive process.   It was erected and in use long
before this court had any authority to issue injunctions.
An injunction to restrain the defendants from repairing
it, or using it, or permitting others to do so, unless some-
thing else was done, would probably make it a worse
nuisance than it is alleged to be now.

   But the plaintiffs contend that the remedy by injunc-
tions in cases of nuisance extends to abatement also, and
some expressions in the cases cited seem to sanction that
position, although, when critically examined, the injunc-
tion seems to have restrained farther erections, and the
decree of abatement to have been a separate measure of
relief.

   Again, nuisances are of two kinds, public and private.
The jurisdiction of courts of equity over public nuisances
is applicable not only to those which are strictly such,
but extends also to encroachments upon public rights, or
property called purprestures.   2 Story's Eq. Jur., sec.
921.   The ground of the jurisdiction is said to be their
ability to give a more complete and perfect remedy than
is attainable at law, in order to prevent irreparable mis-

chief, and also to suppress oppressive and vexatious litigation. 2 Story 925. The ordinary mode of proceeding, in the case of a public nuisance, is by an information filed by the attorney-general. "The instances of the interposition of the court, however, are (it is said) rare, and principally confined to informations seeking preventive relief." "The question of nuisance, or not, must, in cases of doubt, be tried by a jury, and the injunction will be granted, or not, as that question is decided; and the court, in the exercise of its jurisdiction, will direct the matter to be tried upon an indictment, and reserve its decree accordingly." 2 Story's Eq. 923.—May this court, under the general clause in the statute, authorizing the issuing of injunctions, exercise a jurisdiction of this description, and abate a public nuisance?

If we had a general equity jurisdiction, or express jurisdiction in cases of nuisance, we might undoubtedly use an injunction to carry that jurisdiction into effect in any manner in which it is used in other courts. But the question is, whether the power to issue injunctions to prevent injustice confers of itself jurisdiction over all the subject matters in which that is the usual remedial process. It is clear that we have no power to issue an injunction to restrain a husband from taking possession of the property of the wife until he makes a settlement upon her. But it may be answered, that, having in that case no jurisdiction to decree a settlement, the common law right of the husband exists, and that no injustice is done, therefore, by the reduction of the property into his possession without a settlement.

Admitting, however, that the court has plenary jurisdiction, under its power to issue injunctions, to grant appropriate relief in cases of nuisance, another question which arises is, whether the plaintiffs are entitled to maintain a bill in this case. They have no greater rights, in this respect, than any individual owner of property

Dover *v.* Portsmouth Bridge.

affected in like manner by the bridge. The corporation claims to represent and protect the rights of the inhabitants of the town who are owners of property affected by the bridge; but the corporation cannot vindicate any such rights unless it be in some case where a corporate duty exists. Perhaps the town might be heard, in its corporate capacity, where the health of the community was endangered by a nuisance, or where they might otherwise be subjected to expense by reason of pauperism, and in any other case involving corporate responsibility. But nothing of that character appears in this case, and the town cannot maintain the bill on the ground that individual inhabitants are affected in their private interests. Municipal corporations in England may maintain suits in certain cases to vindicate customary or prescriptive rights, but such corporations here are the creatures of the statute, having the powers which the statute confers, and subject to certain prescribed duties. No right appears to exist, on the part of the corporation, to allege that the inhabitants have been accustomed to exercise certain privileges, and that there has been a violation of them, entitling the corporation to sustain a suit against the aggressor. If the town is injured in its corporate rights, or rights of property, it may seek a remedy as a corporation.

The plaintiffs appear to be the owners of wharves within their corporate limits, and claim a right to maintain the bill on that ground also. As the owners of property affected by the bridge, they have similar rights with those possessed by other owners, and may maintain a bill in cases where an individual would be entitled to such a remedy for a like grievance. But an individual could not maintain a bill for the abatement of a nuisance, even if the court has power to abate by injunction, unless he could allege some particular grievance beyond that sustained by the public generally. 14 Conn. R. 565, 579, *Bigelow* v. *The Hartford Bridge Company, and cases cited;*

8 Cowen's R. 146, 156, *Lansing* v. *Smith;* 8 Simons' R. 193, *Spencer* v. *The London & Birmingham Railway Company;* do. 272, *Sampson* v. *Smith.* As an owner of wharves, it does not appear that the plaintiffs sustain any injury by this bridge, other than such as is common to all other owners of property of that description affected by it; and it deserves consideration whether they sustain any such particular injury as entitles them to this mode of redress. If an individual sustains a private injury by a nuisance, he has a remedy by an action on the case. But the writ *quod permittat prosternere*, at law, is obsolete, and a court of equity must have a special case before it to authorize its interference.

Again. This bridge has been erected under color of the authority of this State. If the authority has been pursued, can equity interfere on the application of the plaintiffs? The injuiry, if one is sustained by the plaintiffs, is not direct, but consequential. Their property has not been taken. If it were true, as has been alleged, that the bridge has not been erected in the place specified in the charter, so that the corporation could not justify its erection as against the government, or against the individual owners of the land upon which the abutments have been placed, are the plaintiffs entitled to take that objection in this proceeding, and demand its abatement? If the bridge be a nuisance, it seems to be so because it interferes with public rights, and to have the character of a public nuisance. May rights and wrongs of this character be asserted by the plaintiffs, and tried upon their application in this suit? The cases cited by the plaintiffs in support of the bill are proceedings instituted by the attorney-general, or by some corporate city, founded upon the customary rights of its citizens. If this bridge were to be regarded as a public nuisance, it would seem that the proceedings for its abatement, if founded upon the laws of the State, should be an information or complaint,

or some proceeding in the nature of *quo warranto*, filed by the attorney-general, or an indictment by the grand jury. If the remedy was to be sought under the constitution and laws of the United States, similar proceedings might be had, unless the state should be held to be estopped by its grant to allege that what had been erected in pursuance of the grant was a nuisance. But proceedings in such case might be instituted by the attorney-general of the United States, in the courts of that government, and perhaps by the district attorney. Possibly an indictment might lie in those courts. The language of Mr. Justice *Baldwin*, in *Atkinson* v. *Savage*, cited in a subsequent part of this opinion, has a particular application to the preceding questions.

It has been alleged, in the argument for the plaintiffs, that the bridge is a nuisance, because it obstructs the passage of vessels of war up the river. It is very clear that this is not a ground upon which any individual or town could institute proceedings for its abatement, as a nuisance, if there were no other. It may be doubted whether the state authorities could maintain a bill upon that ground alone.

But from the introduction of an amendment to the bill, alleging and setting forth certain treaties, &c., of the United States, and from the course of the argument, it may perhaps be inferred that the plaintiffs are contemplating some ulterior proceedings in the case, if they fail here ; and as the main question, nuisance or not, has been fully argued, it is perhaps not expedient to go into a further consideration of the questions already suggested. We are desirous of placing the matter in a shape, if we may, which will give the plaintiffs the benefit of any other opinions to which they may suppose themselves entitled.

Assuming, then, for the purpose of this examination, that we have complete jurisdiction, and that the bill is

brought by a competent party, one principle which governs the case is, that equity will grant an injunction to restrain a nuisance, only in cases where the fact is clearly made out upon determinate and satisfactory evidence. 2 Story's Eq. Jur., sec. 924, a; 1 Cooper's Select Cases 333, 343, *Earl of Ripon* v. *Hobart;* 3 M. and Keen 169, 179, S. C. ; and we are of opinion that this bridge cannot be held to be a nuisance on the case before us.

It is shown to have been erected by virtue of a charter granted by the State of New-Hampshire, June 28, 1819, and a charter from the State of Maine, June 23, 1821, by each of which the same grantees were made a corporation by the name of the Proprietors of Portsmouth Bridge, and authorized to erect a bridge across the Piscataqua river between the town of Portsmouth, in New-Hampshire, and the town of Kittery, in Maine.

An objection already referred to is that it was not erected in the place where the charters specified, and it is alleged also that it was not built in a proper manner. But we do not find any such variation from the place, nor any such departure from the grants in the manner of building, that we can hold that the actual erection was not within the powers granted, and that the bridge was thus erected without authority. It is not pretended that there has been an entire departure from the place specified. If there has been a variation in the place in some particulars, or the bridge has been improperly erected, and the plaintiffs have sustained a special damage by reason of the authority not having been followed, which is not common to others, they may have a private suit.

It is further objected, that the bridge is a nuisance because it obstructs the navigation of the Piscataqua river below the town of Dover.

This part of the case presents itself in two aspects, one having reference to the power of the states alone, and raising the objection upon the principles of the common

law, the other drawing into consideration the operation of the constitution of the United States, and the powers of congress in their relation to the subject matter. It has been argued in the first place, very much at large, that the bridge is a nuisance upon the principles of the common law, because the king cannot obstruct a port; and then objection is taken that the legislation from which it derived its existence is repugnant to the powers of congress to regulate commerce, lay and collect duties, &c.

There is evidence that the free navigation of the river is obstructed to some extent by the bridge. A bridge could not well be erected there without having such an effect. But the argument upon the first part of this exception seems to overlook the fact that the grants do not emanate from the executive authority of the states, but from the legislative department, and authorities therefore which relate to the power of the crown only do not apply.

An act of parliament may determine or extinguish public rights in a navigable river. 2 Barn. and Ald. 670, *Voogit* v. *Winch;* 4 Barn. and Cres. 498, *The King* v. *Montague & a.* If the king cannot make a grant to the injury of a port, parliament it appears is not thus limited. It could not be otherwise. Authority must exist somewhere to authorize the obstruction of any navigable water within the limits of a government; and leaving out of consideration the provisions of the constitution of the United States, the state legislatures have powers as extensive in this respect within their several jurisdictions as parliament can have. The proposition does not seem to need authority for its support, but it is well settled that the state legislatures may authorize the erection of bridges over the navigable waters within their respective limits, if the powers and action of the United States interpose no objection.

The language of the court in the *Commonwealth* v. *Breed,* 4 Pick. 463, is, "The legislature has power to regulate

and control by laws all public highways and the navigable waters within the limits of the commonwealth. This power has been exercised from the commencement of our government without objection, and, in the use of it, bridges have been erected over many of the navigable rivers in the State." And again: "In all cases the legislature has the power to inquire when the public convenience and necessity demand these partial obstructions and interruptions to navigation, and upon what terms and conditions they may be established." See, also, 1 Pick. 180, *Commonwealth* v. *Charlestown;* 10 Mass. 70, *Arundel* v. *McCulloch;* 7 Pick. 445, *Charles River Bridge* v. *Warren Bridge;* 12 Pick. 467, *Boston and Roxbury Mill Dam Corporation* v. *Newman.*

The supreme court of New York, in the case, *The People* v. *The Rensselaer and Saratoga Railroad Company,* 15 Wendell 113, place a limitation upon the power by reason of the right of Congress to regulate commerce, and hold that "It is competent to a state government to authorize the erection of a bridge across a navigable river, at a point below where the coasting trade is carried on by licensed vessels, provided that the bridge be built with a draw for the passing of vessels free of expense." But it is said by Mr. Chief Justice *Savage,* in delivering the opinion, "It is, however, a proposition not disputed, that but for the power granted by the constitution to Congress, the state legislatures would have as full and entire control over the waters of their several states, as they would have over the land. It follows, therefore, without the declaratory amendment to that effect, that the states reserve all power not granted to Congress. The entire sovereignty over the waters of the states, then, rests in Congress and the several state legislatures. If this entire sovereignty rested in one government, it could not be doubted that such government might authorize the erection of a bridge across navigable waters, if the business

Dover *v.* Portsmouth Bridge.

and intercourse of society required such an accommodation."

As independent states, New-Hampshire and Massachusetts might have made a compact for the building of a bridge over this river. 12 Peters' Rep. 91, 96, *City of Georgetown* v. *The Alexandria Canal Co.* And they might have authorized the erection of such kind of bridge as they deemed expedient, and have prescribed the place, terms, and conditions. All the territory above the navigable waters above or upon any thoroughfare leading to them belonged to the one or the other of these states, and the inhabitants might have had more than an equivalent for the inconvenience of a bridge in the facilities for intercourse and trade which it furnished. This must have been a matter for the consideration of the respective legislatures having jurisdiction over the soil and waters. Whether the inhabitants above received a benefit or not, they would not have been entitled to compensation for a consequential injury. 8 Cowen 146, 167.

Prior to the Revolution, the power of the colonies of New-Hampshire and Massachusetts over the soil and waters where this bridge is situated were subject to the jurisdiction and control of the mother country. On the declaration of independence, this control being removed, they might have agreed in relation to the manner of the use of the waters, or in regard to the closing of the navigation, or respecting obstructions to it; or they might, by their separate legislation, have acted upon the subject matter, without any responsibility for their acts except to each other, and except, perhaps, that the union of the colonies for their common defence required them to admit the vessels of the other colonies when resorting thither for intercourse or shelter from the common enemy.

By the articles of confederation, in 1778, each state retained its sovereignty, freedom and independence, and every power, jurisdiction and right which was not by

that confederation expressly delegated to the United States in Congress assembled. The provision that the people of each state should have free ingress and regress to and from any other state, and should enjoy there all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions, as the inhabitants thereof respectively, &c., would not have prevented those states from legislating in such a manner as to obstruct the navigation of the river, so long as the use of it was as free to the citizens of other states as to their own. The clause contained in those articles, by which no two or more states should enter into any treaty, confederation or alliance between them, without the consent of the United States in Congress assembled, could not have been construed as prohibiting them from authorizing the erection of a bridge by separate legislation, nor even by direct agreement or compact. In the language of the court (12 Peters 96), "They could, by their joint will, have made any improvement which they chose, either by canals along the margin of the river, or by bridges or aqueducts across it, or in any other manner whatsoever." The acts or agreement by which they should do this would of course not have the character of a treaty, confederation or alliance, within the meaning of the articles of confederation.

Maine succeeded Massachusetts in her rights to the soil and waters of this river; and New-Hampshire and Maine, by their several grants, authorized the erection of this bridge.

Unless the constitution of the United States interposes an objection, their power to do this has been fully shown. There is in the constitution no express prohibition upon the states which renders the erection of bridges over navigable waters within their jurisdiction unlawful. But several objections have been taken to the existence of this bridge, for the support of which reliance is had upon that constitution.

Dover v. Portsmouth Bridge.

1. The states are forbidden, without the consent of Congress, to enter into any agreement or compact with each other, or with a foreign power, &c.; and it is objected that the bridge is an unlawful structure because erected in pursuance of a compact between the states.

It is not quite clear that it could be abated as a nuisance, by virtue of that clause of the constitution, if the states had made an agreement for its erection. But it is not necessary for us to go into a consideration of the import of the term " compact;". and an inquiry whether this prohibition embraces an agreement of such a character, or whether the term was intended to designate some league or alliance, or contract of a political nature. The provision was probably not intended to require the consent of Congress to enable states to agree to run the boundary line between them, or to mark and establish its particular locality, &c.; and if they may agree upon these things, they may agree upon some others without violating their constitutional duties. This clause of the Constitution, in its application to this subject, is of similar import to that contained in the articles of confederation already cited, and the remarks already made upon that will apply. But on the supposition that the states may not make any contract whatever with each other, we find here no evidence of a contract between the states. They grant charters of incorporation, as they may clearly and lawfully do. They authorize those corporations to build a bridge, but they enter into no negotiation, or agreement of any character, with each other, respecting it. There is no express stipulation, nor any implied promise, nor any obligation of one to the other. If the charters had been granted to different corporations, with power to unite, their agreement so to do would not have been an agreement or compact between the states. The corporations would have been private corporations, and their contracts the private contracts of the corporations, and not the compacts, political or otherwise, of the states.

2. The constitution grants to Congress power to regulate commerce with foreign nations, and among the several states, and with the Indian tribes; and it is objected that the act of this state authorizing the erection of this bridge was void, because repugnant to the constitution of the United States in this particular.

The right of Congress to regulate the commerce specified in this article, to the full extent, is not questioned. We concede not only that the states cannot themselves regulate foreign commerce, or commerce among the states; we admit that they cannot obstruct the exercise of this power by Congress.

But the charters which authorized the construction of this bridge are not an exercise of the power, nor an obstruction of its exercise. The legislation from which the structure has arisen had no view to foreign commerce, and prescribes no rules for it, nor is there any enactment of rules for commerce among the states.

The charters and the bridge may serve to facilitate transportation and intercourse by land. The bridge may, to some extent, impede transportation by water. But neither the one or the other operates upon the carriage of passengers or goods so as to form a commercial regulation, or to obstruct the formation and adoption of commercial regulations by Congress.

The provision for the payment of tolls, by those who pass over, may perhaps be regarded as a regulation for the passengers; but this, in such an application, is not a commercial regulation; still less can it make the charters which authorize it commercial regulations or obstructions to the exercise of congressional power.

The grant of the power to regulate commerce cannot, of itself, operate to restrain the states from erecting or authorizing the erection of structures upon the navigable waters within their limits, which may impede or even totally obstruct in a particular place the passage of a

vessel. This seems to be very clear, not only from the nature of the case, and from contemporaneous construction, but also from direct and analogous adjudications. The grant of the power did not take away the jurisdiction of the states over the navigable waters within their limits.

It could not have been in the contemplation of the framers of the constitution, or of the people who adopted it, that the building of wharves, and piers, and of dams for tide mills, was, by means of the power to regulate commerce, placed under the exclusive jurisdiction and control of the government of the United States; and yet all these structures may impede to some extent the passage of vessels or boats in the particular locality where they are situated; and the erection of a wharf without authority from the State has been held to be unlawful. 1 Dall. 150, *Respublica* v. *Caldwell.* So the grant of a right of ferry, for the transportation of passengers and goods across a navigable river, would be a grant which might be used in connection with external commerce, or the ferry-boats might, in some instances, impede the passage of a vessel; but it has not been supposed that the power to grant the ferry was bestowed exclusively upon Congress, or that its exercise by the states was prohibited by the grant of the power to regulate commerce, or any other constitutional power.

The contemporaneous construction upon this subject was, so far as we are aware, uniform. The states have regulated, not only the wharves, but the bridges. Charles river bridge was chartered by Massachusetts in 1785. But that state did not suppose that the power to grant another charter was taken away by the subsequent adoption of the constitution. In 1792 she granted a charter for a bridge over the same river (see 7 Pick. 381), and she has since granted divers other free bridges over that river, and over the river Merrimack. The charter of the Piscataqua

bridge was granted by New-Hampshire in 1793 (see 7 N. H. Rep. 36, 40).

Other bridges are in existence, in other states, it is supposed under state authority exercised many years since. We are not aware that in the legislation which has arisen in relation to the conflicting claims of some of these corporations there has been any suggestion that they were all nuisances, because Congress had the power to regulate commerce.

But the power of the states to erect or authorize the erection of bridges over navigable waters within their limits, so long as no actual legislation of Congress in the exercise of the power to regulate commerce is contravened, would seem to be fully established by the case *Willson* v. *The Blackbird Creek Marsh Co.*, 2 Peters' Sup. C. Rep. 245. The obstruction to the navigation of the creek was in that case a dam, instead of a bridge, and the creek somewhat smaller than the Piscataqua river; but principles of constitutional law in their application to this subject do not depend upon the difference between obstruction by a dam and obstruction by a bridge, nor upon the size of the stream in or over which they may be severally erected.

The opinion of Mr. Justice *Baldwin*, in the case *Atkinson* v. *Savage and others, President and Directors of the Philadelphia Railroad Co.*, is full upon this point. I have found no report of it except in a pamphlet, but it bears some marks of authority which may warrant a reference to it. It appears to have been decided in the circuit court, and to have been published originally in Hazard's Register, in 1834. The learned judge there said, "Laws in relation to roads, bridges, rivers, and other public highways, which do not take away private rights to property, may be passed at the discretion of the legislature, however much they may affect common rights; even private rights, if they are not those of property, may be taken away if it is

deemed necessary for the promotion of public improvements, or if their destruction is the necessary consequence of their construction, without making compensation.

" The legislature had the power to authorize the erection of a dam or causeway which would stop the navigation, if in their opinion it was conducive to the general welfare; whether it would be a discreet exercise of their power is not for this court to decide, as the whole subject is clearly within their discretion, which the judicial power cannot control. 2 Pet. 412; 4 Pet. 563, 4; 4 Wh. 423; 6 Pet. 729. They have thought proper to authorize this company to subject the navigation of the streams on the route of the road to some inconvenience under the obligation, making compensation for the only injury to the common right of the citizens, which they deemed a proper subject of indemnity. In this respect and to this extent they put it upon the same footing as private property; but they have deemed any other inconvenience, expense, or abridgement of navigation, to be matters of subordinate importance to the construction of the same. These are questions of public policy with which we cannot interfere without usurping legislative powers."

" The affidavits produced on the part of the company, especially that of the person employed to construct the bridge, are very strong to show that its erection on the present plan is not only required by considerations of convenience, economy and security, to the company, but that the making of a draw would be productive of very serious obstructions to the navigation, by requiring an additional pier in the bed of the stream, which would narrow the channel at low water, so that vessels could not pass. They also state that the bridge crosses the stream at an angle with the current, whereby vessels would be incommoded and endangered in passing through a draw, and express an opinion that the striking the masts is a much less inconvenience than passing the draw. These

statements and opinions, tend strongly to prove that the powers of the company have not been so exercised as to evince either a want of discretion, or a design to deviate from their authority by perverting it, so as necessarily to impair the rights of navigation. Whether they have abused or misused their privileges, is an inquiry more proper for the legislature to institute under the provisions of the 20th section of the law, than for this court to make on an application for a summary injunction. If we could interfere at all in such an allegation, it would only be on a clear departure from the route, or a palpable abuse of their discretion, in a manner that could admit of no colorable excuse. Such a case we think has not been made out by the complainants."

" We cannot perceive, in the law in question, any excess of legislative authority, any violation of any provision of the state or federal constitution, or in its execution by the defendants, the assumption of any power not conferred upon them, any wanton invasion of public or common rights, or any legal ground for an injunction arresting the further progress of the work on any principle recognized in a court of equity."

" Were it even conceded that the bridge is a common nuisance, or a purpresture, the remedy is in a court of law at the prosecution of the state for the public offence, where the defendants would have the right of trial by jury before conviction. If this court enjoin them, it is in effect an adjudication that the offence has been committed, and the consequences become visited upon them in anticipation of their legal guilt. Whether a court of equity would do this in any case before a conviction at law, is not well settled ; there may be cases where, on the application of the attorney-general, such a proceeding might be sustained; it is unnecessary to give any opinion on such a case till it arises ; it is clear, however, that to sustain such an application, the injury must be a public

one, and can be redressed only at its suit.  18 V. 217, &c.; 2 J. C. 375, &c.; Harg. L. Tracts, 83, 7."

These extracts are in accordance with the principles settled in other cases.  In the *United States* v. *Bevans*, 3 Wheat. 337, it was held, that "the grant in the constitution extending the judicial power of the United States to all cases of admiralty and maritime jurisdiction, does not extend to a cession of the waters in which those cases may arise, or to a general jurisdiction over the same." See, also, 9 Wheat. 1, 203, 235, *Gibbons* v. *Ogden ;* 12 Wheat. 419, *Brown* v. *Maryland;* 11 Peters 102, 133, 147; *City of New-York* v. *Miln ;* 4 Wash. C. C. R. 371, 379, *Corfield* v. *Coryell.*

If the states cannot authorize the erection of bridges over navigable rivers within their limits, by what authority may such structures be authorized.  The affirmative power granted to Congress to regulate commerce is not, in its application to any subject, the power of the dog in the manger,—prohibiting others to use that which it cannot use itself.  The states possessed the power before the adoption of the constitution, and as there is no prohibition, the right to cause a bridge to be erected is still in existence some where.  Has it been transferred exclusively to Congress by the grant to regulate commerce ?  This will hardly be contended.  Does Congress possess the exclusive right, by virtue of the much disputed power to make internal improvements ?  This will not be asserted, for, admitting the power, the conclusion must still be that what Congress may do, by virtue of it, within the states, the states may do themselves if they so please.

We are clearly of opinion that the power to provide a way of this character, across navigable waters within a state, is neither struck out of existence, nor is it, in its character, so identified with regulations of commerce, or with any other of the powers of the general government, that the right to erect or provide for the erection of a

bridge is exclusively vested in Congress. The exercise of such a power by the state, therefore, is not in conflict with, or in obstruction of, the authority of the United States.

But while we thus deny that the existence of this bridge, or the legislation which erected it, conflicts with the powers of Congress, or obstructs their due exercise, we are not disposed to deny that Congress, in the exercise of the power to regulate commerce, may make rules and regulations in relation to the navigation of the Piscataqua, and other rivers, which will necessarily control and restrain the exercise of the state power to some extent, because its further exercise, authorizing other structures which would impede the passage of vessels, would be inconsistent with the lawful action of Congress. But this will by no means show that the states have no power to authorize the erection of bridges, so long as there is no actual legislation of Congress with which such a proceeding is in conflict. And it is not intended to admit that Congress, by any legislation, can control all actions of a state in relation to its navigable waters. Congress may make such regulations as that body may deem expedient in the due exercise of the power to regulate the commerce confided to its care. It cannot lawfully overstep the limits of the power, and interfere with the internal concerns and police of the state. *Pierce* v. *The State*, 13 N. H. Rep. 576, 577.

Whether Congress can so legislate in relation to navigation as to prevent the states from authorizing the erection of bridges over the navigable waters within their limits, if sufficient provision be made for the passage of vessels by means of draws, is a question which we shall probably never be required to settle, and need not speculate upon.

But the inquiry may arise, if Congress may legislate in such a manner as to render the subsequent erection of a bridge unlawful, but the states, in the absence of such legislation may authorize bridges to be erected, may Congress,

subsequent to the erection of a bridge, so legislate as to render its further continuance unlawful; and if it may not, does not this show that the power to erect such bridges over navigable waters is not inconsistent with the power to regulate commerce?

To this inquiry we answer, that in our opinion. Congress cannot, by any direct legislation, declare bridges, wharves, &c., erected by state authority, in the absence of conflicting legislation by Congress, to be nuisances, or prohibit their further continuance.

Congress may legislate fully, notwithstanding. But that legislation must be had with reference to the existing state of things, like much other legislation. It will not follow, because Congress might have so exercised its powers as to have required a bridge to be erected in a particular manner, or even to have prevented its erection, that that body may, by a subsequent exercise of those powers, declare its continuance to be unlawful, or authorize its removal without compensation. If Congress had authorized the construction of a military road, a state or an individual could not place a building upon or otherwise obstruct it. But if the building were first lawfully erected, it could not lawfully be removed as a nuisance, because a road was subsequently laid out; but compensation would be required. This case may not be *ad idem,* but it will serve to illustrate the position, and show that the case presented by the question suggested is not one of a conflict of powers.

The power of Congress to make commercial regulations, being in no wise impaired, restrained, or obstructed, by this bridge, or its charters; if it has been lawfully erected, and Congress should now make any rules which might affect its future existence, they must legislate in this, as in other cases, with reference to existing rights of property, and may be obliged to provide for compensation for property taken, where an earlier legislation would

Dover *v.* Portsmouth Bridge.

have avoided such a result, because it would have prevented the particular property from having been brought into existence. But supposing the rights of the states to legislate in relation to the subject matter is entirely subordinate to the power to regulate commerce, and that Congress may not only prohibit further obstructions in any navigable water, but may require those already there to be removed, the question remains whether there has been any legislation of Congress which renders the erection or continuance of this bridge unlawful.

However plenary may be the powers of Congress, the only action of the United States which is adduced as in conflict with this bridge, is the formation of certain treaties with foreign powers, and the establishment of Dover as a port of delivery. But it is not alleged that there is any treaty giving to a foreign power the right to navigate the Piscataqua river at this place, and we cannot say that the mere existence of a port of delivery above the bridge renders it a nuisance. It does not prevent access to the port. It is provided with a draw and an arch for the passage of vessels and boats. If it may impede the passage of vessels, causing some delay and inconvenience, that is not sufficient. 15 Wend. 132 ; 2 Peters 245, and other authorities before cited ; *Pierce* v. *The State*, 13 N. H. Rep. 574, 581. In order to render the bridge a nuisance, in this view of the powers of the two governments, there must be some direct legislation of Congress inconsistent with its lawful continuance in its present shape. But so far as appears, the provision now made for the passage of vessels is all that Congress would have required, if that body had acted with direct reference to the matter.

We merely add, that it may admit of doubt whether Congress, in the legitimate exercise of its power to regulate commerce, can prohibit future erections of this character by the states, or under their authority, within their own

limits.  At the same time we have no disposition to deny the right of that body to require that bridges hereafter erected shall be built in a particular manner, or with a sufficient draw for the passage of vessels, &c.  There may, however, be cases in which the interests of commerce would justify an absolute prohibition to build such a structure within specified limits.  The question presents a field of speculation into which it is not necessary nor expedient that we should enter.  Perhaps Congress alone must be the final judge of the necessities of commerce in this particular.  But there is little danger of any collision between the general and the state governments on this point.

3. It is objected that the act of New-Hampshire is invalid, by reason of the power of Congress to lay and collect duties.  Much that has already been said will apply to this point.  It may be added that the bridge does not interfere with the entry of vessels, there being no port of entry above it.  If there was one, the bridge might still be of much greater convenience for travel, transportation, and intercourse, than any inconvenience which would be suffered by the delay of vessels in entering or leaving the port, and a grave question would arise whether the judicial department, in that state of facts, could, on the existing legislation, declare it to be a nuisance.

4. Another ground of constitutional objection is that Congress have power to provide and maintain a navy, and for the general defence of the United States, and the protection of each of them from invasion.  ·

But that this forbids the erection of this bridge cannot be maintained without assuming, either that this power prevents the states from authorizing any structure within navigable waters lying in their limits, which might prevent a vessel of war from lying on the spot, or the placing works of defence there, or else that this bridge is an actual impediment to the protection of the navy or the coast.

The first of these positions we trust we have shown to

be untenable, in our remarks relative to the power to regulate commerce, in which we endeavored to show that it could not be construed to exclude all state action over navigable waters.    To the second we answer, that it remains to be shown that the bridge does or may actually impair the efficiency of the navy, or of the means of defence.    We should not be willing to do the naval armament the injustice to suppose it might desire to resort to the waters above this bridge, as a place of safety, and hold the bridge a nuisance for that reason, notwithstanding the fact that those waters were upon a former occasion a place of refuge for a solitary frigate.

Finally.    If, under the pretence of the accommodation of travel and transportation from place to place, the design or principal effect of this bridge was to destroy commerce, obstruct the collection of the revenue, or prevent the navy from resorting to navigable waters, or to naval yards or depots necessary for their use, its existence would be truly a nuisance which ought in some form of proceeding to be abated.    We insist that considerations of this character may serve to test the validity of state legislation in reference to this power of Congress to regulate commerce.    See *Pierce* v. *The State of New-Hampshire*, 13 N. H. Rep. 578.    But nothing of that kind is even suggested in this case.

*Bill dismissed.*